**MID–WEST CONSTRUCTION CO., Ltd.**

**v.**

**The UNITED STATES.**

**No. 123–66.**

United States Court of Claims.

June 16, 1972.

Maurice F. Ellison, Jr., Washington, D. C., for plaintiff, Henry B. Keiser, Washington, D. C., attorney of record; David V. Anthony, and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen., L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## OPINION

NICHOLS, Judge.

This case grew out of the cancellation by the defendant of contract No. 01–50 between the defendant and the plaintiff, a Canadian corporation. Under the contract, the plaintiff was to construct for the Forest Service of the Department of Agriculture 3.15 miles of Portage Bay Road No. 6316 in the North Tongass National Forest, Alaska. Before any substantial amount of work was done by the plaintiff—and, indeed, before any formal notice to proceed with the work under the contract was ever issued—the contract was canceled by the contracting officer on December 7, 1964, in accordance with a decision rendered by the Comptroller General of the United States.

The present case has already been before us on one occasion, when we considered a motion for summary judgment filed by the defendant and a cross motion for partial summary judgment filed by the plaintiff. In a decision dated December 15, 1967 (181 Ct.Cl. 774, 387 F. 2d 957), we denied both motions and remanded the case to the commissioner for further proceedings. In disposing of the motions, however, we held that the cancellation of the contract was unlawful, and that the plaintiff would be entitled to recover if—and only if—it could "prove that it was ready, able, and willing to perform." We do not repeat the facts there set forth as relevant to that decision.

Commissioner White conducted a trial in Alaska during August and September, 1970. His report included a recommended opinion and findings of fact. We agree with the first part of his opinion, entitled I. *Readiness to Perform,* and set it forth hereinafter with verbal modifications. We agree with the second part of his opinion, entitled II. *Damages,* and adopt the same except for important revisions in subsections F. *Equipment Stand-By Expense* and G. *Cost of Moving Out Equipment.* Our revisions to subsection F. will necessitate an upward adjustment in the $53,314.48 damages the commissioner awarded. Our revisions to subsection G. do not alter the denial of damage under that head. Some findings of fact would have had to be altered to conform, but to conserve space, our findings of fact are incorporated in the opinion to the extent we deem them necessary.

## I. *Readiness to Perform*

■ The evidence adduced at the trial is sufficient to show, and we find that the plaintiff "was ready, able, and willing to perform" the Portage Bay contract at the times deemed to be significant, *i. e.,* when the contract was entered into by the parties (July 14, 1964), when the notice to proceed was supposed to be issued in accordance with the agreement of the parties (September 1, 1964), when

the Comptroller General advised the Department of Agriculture that the contract should be canceled (B–154756, 44 Comp.Gen. 253, November 2, 1964), and when the contracting officer formally canceled the contract (December 7, 1964).

In an attempt to defeat any recovery by the plaintiff, the defendant asserts in its brief that "Plaintiff has not, and cannot, demonstrate that it was willing or able to perform the Portage Bay contract commencing in the spring of 1965." This is undoubtedly a correct factual statement, because the plaintiff withdrew the last of its personnel from Alaska on December 8, 1964, and removed its equipment and supplies from Alaska in February and March of 1965, so that—as asserted by the defendant—the plaintiff was not in a position to undertake the construction of the Portage Bay road in the spring of 1965. However, the defendant does not furnish a persuasive explanation as to just why the plaintiff's inability to perform the Portage Bay contract in the spring of 1965 has any significance with respect to the right of the plaintiff to recover in the present action.

Actually, it was the defendant's cancellation of the Portage Bay contract which prompted, if it did not necessitate, the plaintiff's decision not to conduct any further operations in Alaska and to remove its personnel and equipment from Alaska. It is not necessary to give the details here. For present purposes, it should suffice to say that during the period beginning in 1961 and extending into October of 1964, the plaintiff completed five separate construction contracts for the defendant in Alaska, and had capacity to continue to conduct operations in Alaska for the indefinite future.

Perhaps it should be mentioned that the plaintiff, in late October of 1964, sold two pieces of equipment that could have been used effectively on the Portage Bay job. However, this was done after the contracting officer—despite the agreement between the parties that the

formal notice to proceed with the work under the contract would be issued on or about September 1, 1964—had informed the plaintiff in a communication dated October 19, 1964, that "we do not plan to issue a Notice to Proceed with the work on the Portage Bay Road this year." Plaintiff also sought other work that October which it could have performed concurrently with the instant contract, if awarded to it. Furthermore, the evidence in the record indicates that after the sale of the two pieces of equipment just mentioned, and up until February of 1965, the plaintiff still had in Alaska other pieces of equipment which could have been substituted for the sold items in the performance of the Portage Bay contract, if the contract had not been canceled on December 7, 1964.

Obviously, the plaintiff could not reasonably be required to maintain its readiness to perform the Portage Bay contract until the spring of 1965, when the contract was formally canceled by the defendant on December 7, 1964.

## II. *Damages*

The plaintiff alleged in its petition, as amended, that its allowable damages amounted to $459,656.98. Following the trial, however, the plaintiff asserted in its post-trial submission that its allowable damages amounted to not less than $238,305.17 and not more than $456,576.66. On the other hand, the defendant has taken the position that if the plaintiff is entitled to any recovery at all, such recovery must be limited to $3,830.81. It is my conclusion that none of these widely varying amounts is acceptable.

With respect to the plaintiff's minimum and maximum demands of $238,305.17 and $456,576.66, it is pertinent to note that if the Portage Bay contract had not been canceled and the plaintiff had incurred all the expenses involved in the complete performance of the contract, the plaintiff would have been entitled to receive from the defendant only $337,060.06 (approximately) as the full contract price. As it was, the contract was canceled before any equipment (other than a power saw) or personnel (other than two workmen) was assembled at the job site by the plaintiff, and before any work was done at the job site (other than the cutting of timber on the right-of-way by two workmen for 1 day).

The controversies between the parties concerning the allowable damages, and my views relative to the items in dispute, will be indicated in the succeeding subdivisions of this part of the opinion.

A. *Bidding Costs*. The plaintiff's claim in the amount of $1,273.31 for bidding costs included a $60 item which was alleged to represent the cost of a round trip by air from Petersburg, Alaska, to Portage Bay, and return, by Allen L. Hatherly ("Mr. Hatherly"), a supervising engineer employed by the plaintiff, in order to look at the site of the prospective Portage Bay job. This claimed expense was not reflected on the plaintiff's books of account, and the defendant (not surprisingly) objected to it. However, Mr. Hatherly testified at the trial that he took the trip on a plane operated by Alaska Coastal Airlines, that the fare was $60, and that he made an entry concerning the trip in his diary, which was available in the courtroom for examination by defendant's counsel. In view of this testimony, it is concluded that the $60 item should be allowed.

Another controversy between the parties relative to bidding costs involved a $405 item which, according to the plaintiff, represented the estimated cost of a trip by air which Mr. Hatherly made in a company-owned plane from Sitka, Alaska, to Prince George, B. C., for the purpose of reporting "on the job conditions" to the plaintiff's top management. The plaintiff did not introduce any evidence—and the record does not otherwise contain any information—concerning the actual per-mile, per-hour, or other unitary cost of operating the company-owned aircraft. Consequently, it is necessary either to reject this item in its entirety or to make a completely uninformed guess as to what it cost the plaintiff to operate its plane on the trip from

Sitka to Prince George. Since it was the plaintiff's responsibility to provide the court with data on which a reasonably accurate determination could be made concerning the amount of the plaintiff's damages, the outright rejection of the $405 item seems justified.

The plaintiff's claim for bidding costs included a $450 item which was alleged to cover the salary that was paid to Mr. Hatherly during the time when he was examining the site of the prospective Portage Bay job and preparing the plaintiff's bid on the contract. Mr. Hatherly estimated that he devoted a total of 9 working days to these activities, but the defendant took the position that 6 working days should have been sufficient for such purposes. In view of the size and complexity of the prospective Portage Bay project, an allowance of 9 working days, as claimed by the plaintiff, for the inspection of the job site and the preparation of the plaintiff's bid would seem to be reasonable. However, since the evidence indicates that Mr. Hatherly's salary at the time in question was $750 per month, and that the plaintiff's personnel customarily worked 22 days per month, an allowance of $315 for Mr. Hatherly's salary during the 9-day period (calculated at the rate of $35 per day) would seem to be more reasonable than the $450 claimed by the plaintiff.

The plaintiff estimated that its president and its general manager each devoted a total of 1 day's time to the task of supervising the preparation and submission of the plaintiff's bid, and that the sums of $150 and $100, as the equivalents of their respective daily salaries, represented allowable bidding costs. The plaintiff also estimated that the typing and mailing costs with reference to the bid on the Portage Bay contract amounted to $15. All of these items were objected to by the defendant. The items referred to in this paragraph, although admittedly based on estimates, are considered to be reasonable and allowable.

When the undisputed items in the plaintiff's claim for bidding costs ($32.50 for plane fares, $24.81 for hotel accommodations, and $36 for expenses) are considered along with the determinations made in this subdivision of the opinion, it appears that the plaintiff's claim for bidding costs should be partially allowed in the total amount of $733.31.

■ B. *Head Office Overhead.* This claim in the total amount of $19,722.73 consisted mainly of a $17,500 item for head office wages. The plaintiff introduced evidence at the trial to show that this item was based upon an estimate of the amount of time which Benjamin G. Ginter ("Mr. Ginter," president of the plaintiff and its parent corporation), A. L. Kos ("Mr. Kos," general manager of the Ginter enterprises), Mr. Hatherly (previously mentioned in subdivision A of this opinion), and a secretary spent during the 1964–68 period in "preparing a claim mostly and in fighting this cancellation of this contract." It was estimated that Mr. Ginter devoted a total of 55 days at $150 a day to such endeavors, that Mr. Kos devoted 55 days at $100 a day, that Mr. Hatherly devoted 25 days at $50 a day, and that the secretary devoted 100 days at $25 a day. In each instance, the monetary figure represented an allocation out of annual salary by the plaintiff.

It seems to be clear that the persons involved in the $17,500 item for head office wages performed the activities in question mostly after the cancellation of the Portage Bay contract in December 1964, and to a substantial extent after the filing of the present court action in April 1966. Some of this work may have been—and probably was—done before the cancellation of the contract and while the plaintiff was hopeful of preventing the cancellation. However, the evidence in the record does not provide any basis on which a reasonably precise allocation of activities could be made as between efforts to prevent the cancellation of the Portage Bay contract and efforts after the cancellation designed to recover compensation for the damages sustained as a result of the cancellation. Consequently, the sums representing sal-

ary payments made to such persons for time devoted to the activities now under consideration must, as a practical matter, be lumped together as expenses looking toward the recovery of compensation for the damages sustained as a result of the cancellation of the Portage Bay contract and, therefore, as not being allowable in the present action.

What has been said with respect to head office wages is also applicable in principle to an item of $1,076.45 representing the cost of telephone calls during the 1964–67 period, the sum of $22.23 out of an item of $202.51 representing the cost of telegrams (the defendant has conceded that the sum of $180.28 is chargeable to the Portage Bay contract), an item of $278.52 representing travel expenses incurred by Mr. Ginter on December 10, 1965, and an item of $193.38 representing travel expenses incurred by Mr. Kos during the period December 26–31, 1964. The plaintiff did not introduce any evidence which would justify a determination that these expenses (or any of them) had a reasonable relationship to the performance of the Portage Bay contract or to efforts before December 7, 1964, to prevent the cancellation of the contract. With respect to the 1964 telephone calls, it is not known to what extent they related to the Portage Bay contract and to what extent they related to the plaintiff's other operations in Alaska. As for the telephone calls during 1965–67, Mr. Ginter's travel on December 10, 1965, and Mr. Kos' travel during the period December 26–31, 1964, they all occurred after the cancellation of the Portage Bay contract on December 7, 1964, and could not have related to the performance of the contract or to efforts to prevent the cancellation of the contract. Therefore, the portions of the claim for head office overhead discussed in this paragraph cannot properly be allowed.

The claim for head office overhead included an item of $471.87 relative to travel expenses allegedly incurred by Mr. Kos and a lawyer during the period October 23–28, 1964. The defendant, on the basis of its audit of the plaintiff's books of account, verified the making of this expenditure and that the travel related to the Portage Bay contract, but the defendant objected to the allowance of the item in the absence of a clear showing by the plaintiff that the travel in question was unrelated to the preparation of the plaintiff's claim. However, as the evidence in the record indicates that this travel was performed not only prior to the cancellation of the contract but also prior to the issuance of the Comptroller General's advice that the contract should be canceled, it can reasonably be inferred that the travel was performed by Mr. Kos and the lawyer in an effort to prevent the cancellation of the contract, rather than in connection with the preparation of a future claim. As of the time when this travel was performed, it was still an open question as to whether the Portage Bay contract would be canceled as a result of the filing of a protest against the award of the contract to the plaintiff. Accordingly, this $471.87 item is regarded as allowable.

It appears, therefore, that the plaintiff's claim for head office overhead must be rejected, except for the $180.28 of telegram costs conceded by the defendant to be chargeable to the Portage Bay contract and the item of $471.87 representing travel expenses incurred by Mr. Kos and a lawyer in October 1964. Thus, the total amount allowable as head office overhead is $652.15.

C. *Attendance at Pre-Construction Conference.* The plaintiff claimed $190.-60 as representing the expenses incurred by two supervisory officials in attending a pre-construction conference with personnel of the Forest Service. The defendant conceded that $158.40 was properly allowable on this claim. The plaintiff then stated that the figure of $158.40 was acceptable to it.

D. *Cost of Initiating Work at Job Site.* The plaintiff's claim in the amount of $1,598.53 to cover the purported cost of initiating work at the site of the Portage Bay project included a $609.96 item

for labor, and this was alleged to represent wages paid to two workmen, R. Olson and L. Heiner. The defendant's audit of the plaintiff's books of account revealed the payment of wages in the amount of $245.18 to Messrs. Olson and Heiner through September 1, 1964, but as such wages were charged on the plaintiff's books to another Alaska construction job which the plaintiff was performing at the time for the Forest Service at Hamilton Bay, the defendant objected to the $245.18 being regarded as an allowable cost in the present litigation. However, the evidence in the record places L. Heiner at Portage Bay on August 29, 1964, places B. Olson at Portage Bay on August 31, indicates that Messrs. Heiner and Olson set up a camp on the beach at Portage Bay, shows that they cut down timber along the right-of-way of the Portage Bay road on September 1, and discloses that they left Portage Bay on September 2. In view of this, it seems appropriate to allow the sum of $245.18 as a cost incurred by the plaintiff in connection with the Portage Bay job. There is nothing in the record to show that the remainder of the $609.96 claimed by the plaintiff as labor costs actually represented the cost of work done at the site of the Portage Bay project.

█ The claim now under consideration also included a $72.50 item which was alleged to represent the cost of operating a power saw for 58 hours, at the rate of $1.25 per hour. As indicated in the preceding paragraph, two employees of the plaintiff spent 1 day (September 1, 1964) at the task of cutting down timber along the right-of-way of the Portage Bay road. Since the plaintiff's claim refers to "power saw" in the singular, the two employees presumably operated one power saw between them. As there is nothing in the record to show that their workday exceeded 8 hours, the maximum proper allowance to cover the cost of operating a power saw at the job site would seem to be $10.

The job site claim further included an item of $225 which was alleged to cover the cost of supervising the initiation of work at the job site. The defendant's audit of the plaintiff's books of account verified salaries in the amount of $181.40 to supervisory personnel as being allocable to the initiation of work at Portage Bay. The plaintiff did not present any evidence at the trial to prove that this item of expense actually exceeded the $181.40 figure verified by the defendant. Consequently, the item relating to supervision should be allowed only to the extent of $181.40.

In addition, this particular claim included a $50 item which was alleged to cover expenses incurred by three supervisory officials, J. Turner, J. Rempel, and W. Sherlock. The defendant's audit of the plaintiff's books of account failed to verify any portion of this $50 item, and the plaintiff did not offer any evidence at the trial to prove that such expenditure was made and was properly chargeable to the cost of initiating work at the site of the Portage Bay project. Therefore, this item cannot properly be allowed.

When the undisputed items in the job site claim ($445 for transportation and $196.07 for material and supplies) are considered along with the determinations made in this subdivision of the opinion, it appears that the plaintiff's claim with respect to the cost of initiating work at the site of the Portage Bay project should be partially allowed in the total amount of $1,077.65.

E. *Cost of Terminating Arrangements to Proceed to Perform the Contract.* The plaintiff submitted a claim in the total amount of $2,687.03 under this heading, and the various items of expense making up the claim were verified by the defendant's audit of the plaintiff's books of account. However, the evidence that was introduced at the trial showed that J. Turner, the plaintiff's superintendent in Alaska, whose salary for the period October 8–December 8, 1964, made up more than half of this claim, actually devoted about 3 days during the period in question to the task of supervising some work that the plaintiff

was doing for the Forest Service at another place in Alaska. Mr. Turner's salary for the three days amounted to $110.40, and this should be deducted from the $2,687.03 claim, leaving $2,576.63 as the amount properly allowable.

F. *Equipment Stand-By Expense.* The plaintiff initially presented to the court a claim in the amount of $344,887, to cover the plaintiff's alleged equipment stand-by costs. Later, the plaintiff revised the amount of this claim to a "minimum" of $126,615.51. The defendant has taken the position that this claim for equipment stand-by expense must be wholly disallowed because the "incurrence of [such] expense was terminated prior to the date a notice to proceed was even contemplated and machines were never moved to the site."

In order to dispose of the parties' contentions with respect to the claim for equipment stand-by expense, it is necessary to set out a substantial amount of background material.

In the first place, it should be noted that paragraph 6.2 of Section 6 of the General Requirements of the Portage Bay contract provided in part that "Following receipt of notification of award, and after required bonds are furnished, the contractor will receive a notice to proceed with the performance of the construction required by the contract." The contract further provided that the contractor was "to commence the work within twenty (20) calendar days after the date of receipt of notice to proceed, and to complete the work within two hundred and fifty (250) calendar days after the date of receipt of notice to proceed." These provisions obviously contemplated that the notice to proceed would be issued with reasonable promptness after the contract was entered into and the required bonds were furnished by the contractor.

Invitations for bids on the Portage Bay contract were issued by the Forest Service on May 26, 1964. The proposal called for the construction of Portage Bay Road No. 6316 in the North Tongass National Forest, Alaska. This project was to be located near the head of Portage Bay on Lindenberg Peninsula, approximately 20 miles by water northwest of Petersburg, Alaska. It was indicated that there was a total small-business set-aside in connection with the project and, therefore, that the award would be made to a bidder qualifying as a small business.

The bids on the Portage Bay contract were opened on June 25, 1964, and it was determined that the plaintiff was the low bidder. On June 29, the next low bidder, B & A and Yutan Construction Company ("Yutan"), protested to the contracting officer that the plaintiff was not a small business and, therefore, was not eligible to bid. The contracting officer forwarded the protest to the Seattle, Washington, regional office of the Size Standards Division, Small Business Administration. The regional office rendered a decision in favor of the plaintiff, and this decision was affirmed on July 13, 1964, by the Acting Director of the Size Standards Division, Small Business Administration, in Washington, D. C.

On July 14, 1964, the contracting officer sent to the plaintiff a telegram stating that its bid had been accepted. Thereafter, both parties duly signed the contract as of July 14, and the plaintiff submitted to the contracting officer acceptable performance and payment bonds dated July 24, 1964.

In the meantime, on July 14, Yutan notified the contracting officer that it was filing an appeal with the Size Appeals Board of the Small Business Administration from the July 13 decision of the Acting Director of the Size Standards Division. The contracting officer replied to Yutan on July 14, stating that he had awarded the contract to the plaintiff because "any further delay in the procurement action * * * would be disadvantageous to the Government."

In a letter dated July 20, 1964, and addressed to the Comptroller General of the United States, Yutan protested against the award of the contract to the

plaintiff, and requested that it be rescinded.

Notwithstanding the pendency of Yutan's protest, the Forest Service scheduled a pre-construction conference relative to the prospective performance of the work under the Portage Bay contract by the plaintiff. This conference was held in Juneau, Alaska, on August 6, 1964, and was attended by the contracting officer and other representatives of the Forest Service, by Joe Rempel, who had been in charge of the plaintiff's operations in Alaska but who was soon to be replaced, and by James E. (Jim) Turner, who was scheduled to take over from Joe Rempel within the reasonably near future the task of supervising the plaintiff's operations in Alaska.

In view of the reference in the preceding paragraph to the plaintiff's operations in Alaska, perhaps it should be explained at this point that during the 4-year period immediately preceding the time when the plaintiff entered into the Portage Bay contract, the plaintiff had been involved in the construction of five separate projects for the defendant in Alaska. Of the five projects, the last two were commonly referred to as the Sitka Highway job, which was started in August of 1962, and the Second Hamilton Bay job, which was begun in August of 1963. Work on these two jobs was still in progress when the plaintiff and the defendant entered into the Portage Bay contract in July of 1964. The plaintiff planned to perform the Portage Bay job with equipment transferred to Portage Bay from Sitka and Hamilton Bay, as the work at those places was completed. (The Sitka Highway job would be completed on September 5, 1964, and the Second Hamilton Bay job would be completed on October 7, 1964.) Sitka, Hamilton Bay, and Portage Bay are situated along an arc approximately 50 or 60 miles south and southwest of Juneau, Alaska.

One of the subjects discussed at the pre-construction conference in Juneau on August 6, 1964, was when the notice to proceed with the work under the Portage Bay contract should be issued. The representatives of the plaintiff stated that the plaintiff would prefer that the notice to proceed be issued on or about September 1, 1964, so that the beginning of operations at Portage Bay could be coordinated with the phase-out of operations at Sitka and at Hamilton Bay, and equipment from those jobs could be made available for use in the performance of the work at Portage Bay. The representatives of the Forest Service indicated that the September 1 date suggested for the issuance of the notice to proceed was satisfactory to the defendant. It was then agreed that the plaintiff, after its personnel and equipment became available, would transfer to the Portage Bay job site the men and equipment needed for the initial stage of the work and would then notify a representative of the Forest Service, who would thereupon transmit the information to the contracting officer, and the latter would issue a formal notice to proceed.

On August 28, 1964, the Size Appeals Board of the Small Business Administration issued its findings and decision, as adopted by the Administrator of the SBA, on Yutan's appeal. The Board sustained Yutan's appeal and held that the plaintiff, a Canadian corporation, did not qualify as a small business concern because it "does not maintain a place of business in the United States." Three days later, on August 31, the contracting officer called Jim Turner, the plaintiff's superintendent in Alaska, on the telephone, informed him that a further complication had arisen in connection with the Portage Bay contract, and stated that the notice to proceed would not be issued on September 1, as agreed upon at the pre-construction conference.

However, the plaintiff had already sent two workmen to the site of the Portage Bay job and, as indicated in another subdivision of this opinion, they cut timber along the right-of-way of the Portage Bay road on September 1, before they received word in the late afternoon of September 1 that they should

not do any further work on the project. The two workmen left Portage Bay on the following day.

On September 3, the contracting officer called Jim Turner on the telephone again and instructed him not to incur any more expense in connection with the Portage Bay contract until further notice.

Subsequent to the contracting officer's telephone call to Jim Turner on August 31, and continuing until October 19, at least, the plaintiff's president was in frequent contact with the contracting officer concerning the delay in the issuance of the notice to proceed with the work under the Portage Bay contract. The contracting officer expressed optimism that the complications which had arisen by virtue of Yutan's protest would be overcome and that the plaintiff would be able to proceed with the performance of the work under the contract.

As the equipment which the plaintiff planned to use on the Portage Bay job became available for such work due to the completion of the Sitka Highway and Second Hamilton Bay jobs, the plaintiff prepared the equipment for transportation by barge from Sitka and Hamilton Bay to the Portage Bay job site. However, because of the contracting officer's instructions, such equipment was not actually transferred to Portage Bay, but was held in readiness at Sitka and Hamilton Bay.

On October 19, 1964, the contracting officer sent to the plaintiff a letter stating as follows:

> Since the construction season in this area is nearly over for this season we do not plan to issue a Notice to Proceed with the work on the Portage Bay Road this year.

Subsequently, on November 2, 1964, the Comptroller General issued his decision (No. B–154756, 44 Comp.Gen. 253) advising the Secretary of Agriculture that the award of the Portage Bay contract to the plaintiff should be canceled. The plaintiff learned of this on or about November 9, and immediately sent to the Comptroller General a telegraphic "appeal," actually a request for reconsideration, and continued to stand in readiness to perform. Over its solicitor's signature, the plaintiff submitted to the Comptroller General, a written brief setting forth facts and legal arguments showing why the contract should not be canceled. This bears the purported date of November 10, but apparently was not received via the mail at the General Accounting Office until shortly after the cancellation had rendered it moot. Mr. Ginter learned by telephone of the cancellation about December 3, though the formal notice of cancellation is dated December 7. On so learning on December 3, Mr. Ginter took steps to cause the equipment that would have been used on this job to be removed by barge to Prince Rupert, B. C., Canada, and secured the award of a construction contract there in January, 1965, work to begin in February and March. It could have been done earlier only at exorbitant cost. In winter, on the Alaskan inland waterway, construction equipment can be moved south, at reasonable expense, only by utilizing on their return barges that have carried construction equipment north. Mr. Ginter had little expectation that anyone else would bear this removal expense, and therefore compromised celerity with cost. He did not remove all equipment, but sold some in Alaska.

The facts thus far summarized in this subdivision of the opinion warrant the conclusion that the defendant, in violation of the Portage Bay contract, unreasonably delayed the issuance of a notice to proceed with the work under this binding contract, and that the defendant should bear the responsibility for expenses incurred by the plaintiff in holding equipment on stand-by at Sitka and Hamilton Bay for transfer to Portage Bay. This makes it necessary to consider several subsidiary questions that are involved in the equipment stand-by claim.

One question is whether the plaintiff is entitled to reimbursement for equipment stand-by expense on all the equip-

ment which it had at Sitka and Hamilton Bay, or only on a portion of such equipment. The preponderance of the evidence in the record shows that the plaintiff did not intend to use—and could not have used effectively—on the Portage Bay job all of the equipment which it had been using on the Sitka Highway and the Second Hamilton Bay jobs. The commissioner found the list of equipment that would have been needed for the Portage Bay job. We do not repeat his list here as he will have to recompute the equipment standby expense and make a new finding.

■ Another question relates to the period of time for which such reimbursement should be allowed. As the Sitka Highway job was completed on September 5, 1964, and as the Second Hamilton Bay job was completed on October 7, 1964, it appears that the reimbursement period for those pieces of equipment at Sitka which would have been needed for the performance of the Portage Bay job should begin as of September 5, 1964, and that the reimbursement period for the pieces of equipment at Hamilton Bay which would have been needed on the Portage Bay job should begin as of October 7, 1964. The selection of a beginning date earlier than September 5 would not be warranted. Although it had been agreed by the parties that the notice to proceed with the work under the Portage Bay contract would be issued on or about September 1, the evidence indicates that the plaintiff did not intend to have any equipment at the job site as early as September 1 (other than a power saw, as indicated earlier in this opinion).

The commissioner, for purposes of his computation, terminated the equipment stand-by period in mid-December. This was on the premise that plaintiff knew the contract would be canceled early in November. We find no evidence to support an earlier date for this knowledge than December 3, and up to then, plaintiff was actively seeking reconsideration of the Comptroller's decision. It was not obliged to terminate the stand-by in the midst of this effort, at a time when the Forest Service had not indicated whether it would, in fact, cancel. By December 3 the difficulties of winter removal were imminent, and so far as the record shows, a person who made his decision on that date could not have removed economically sooner than the plaintiff did. If the plaintiff had elected to continue to operate in Alaska, it might well have kept its equipment on stand-by, at defendant's expense, during the whole anticipated life of the contract. The obtaining of work at Prince Rupert, and the removal of equipment there, was in mitigation of damages. The compensable stand-by period we hold should continue until removal of the equipment was actually effected.

As the record does not contain evidence with respect to the plaintiff's actual equipment stand-by expense, it is necessary to decide upon some method to be used in calculating the reasonable equivalent of such expense. In this connection, the plaintiff argued for the use of certain "all found" rental rates which included operators' wages, the resulting amounts to be reduced by 50 percent because of the stand-by status of the equipment during the period in question. However, the evidence shows that the plaintiff's equipment was owned outright and not rented, and that the plaintiff did not employ any operators for such equipment during the stand-by period.

■ Accordingly, it appears that the most acceptable way of determining an allowance for equipment stand-by expense is to utilize the rates set out in the fifth edition of the Contractors' Equipment Ownership Expense manual, issued by the Associated General Contractors of America, the fifth edition being the one that was in effect for the 1964 construction season. This manual contained guidelines with respect to the average cost per working month of owning and maintaining construction equipment, and included the items of depreciation, major repairs and overhauling, interest on in-

vestment, storage, incidentals and equipment overhead, insurance, and taxes.

■ G. *Cost of Moving Out Equipment*. The plaintiff presented a claim in the amount of $42,109.37 under this heading, and alleged that it covered the costs and losses which the plaintiff incurred in connection with the removal of equipment and supplies to Canada under the circumstances related in subdivision F of this part of the opinion. The defendant objected to any award being made to the plaintiff on this claim.

The plaintiff's decision to remove to Prince Rupert and not operate further in Alaska, was motivated by factors Mr. Ginter explained at length in his testimony. His contracts in Alaska had not been successful, from his point of view. He had lost a million on the Sitka job alone. As a Canadian, he evidently incurred much resentment by competing for Alaskan work. He had continuous labor troubles, he was threatened with physical harm, his equipment was sabotaged, and contract awards were denied him on the basis of what he regarded as flimsy technicalities. Not only was the loss of the Portage Bay job serious of itself, but the concomitant decision that he could not qualify as a "Small Business" meant he would be out of competition for future awards, to the extent they were set aside for small business. A United States Government Official who troubled to acquaint himself with the history of Mr. Ginter's Alaskan invasion might have foreseen that the cancellation here involved would be the last straw, but in the case of a claim sounding in contract, not tort, foreseeability is not the touchstone that determines whether an item of cost is compensable.

Much of the equipment plaintiff used in Alaska was American-made, but had been purchased in Canada. Canadian customs duties had been paid on these items, and they could be re-introduced into Canada, without incurring new duties. If they were to be sold, it would presumably be advantageous to sell them in Canada, since the American values would then be enhanced by the Canadian duties. In fact, plaintiff removed to Prince Rupert, not only equipment which it used there, but also equipment which it sold there without any further use.

A majority of the court is of the opinion that the removal expenses were incurred for the furtherance of the plaintiff's general corporate purposes, and that they lack sufficient nexus with the instant contract to be compensable as part of the damages for its breach. The writer of this opinion would have liked to allow this item, in an amount not to exceed the standby allowance that would have been applicable if plaintiff had not removed, and this on the theory that such expenses were incurred in an effort to mitigate the damages. It must be confessed, however, that the support of this theory to be found in Mr. Ginter's testimony is short of compelling. In deciding on removal, he was not thinking in terms of mitigating damages. These Americans being so resolved to ruin him, as he thought, he viewed the recovery of any damages in an American tribunal as a remote contingency.

■ H. *Loss of Anticipated Profit*. The plaintiff submitted a claim in the amount of $47,118.41 under this heading, alleging that such amount represented the anticipated profit on the Portage Bay contract which the plaintiff lost as a result of the cancellation of the contract. This claim was objected to by the defendant in its entirety.

The plaintiff did not introduce any evidence which would warrant a determination that the plaintiff would have made a profit on the Portage Bay contract if the plaintiff had performed the work under it. With respect to the five construction jobs which the plaintiff had previously performed in Alaska, the plaintiff made a profit on some of the work and sustained a loss on other work. Overall, the plaintiff sustained a loss on the five jobs.

In the absence of a showing that the plaintiff would have made a profit on the Portage Bay contract if the contract had not been canceled and the plaintiff

had done the work under it, the plaintiff is not entitled to any award on its claim based upon the alleged loss of anticipated profit.

### III. *Judgment*

Accordingly, judgment is entered for the plaintiff, with damages computed as provided in this opinion, except that damages under subsection II.F. shall be recomputed in further proceedings under Rule 131(c).