**346**

**SHANK–ARTUKOVICH, a Joint Venture, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 305–84C.

United States Claims Court.

Sept. 29, 1987.

David P. Yaffe, with whom was Joseph A. Miller, Universal City, Cal., for plaintiff.

Michael T. Paul, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, Director, and Thomas W. Petersen, Asst. Director, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This opinion is issued following trial, extensive post-trial briefing, and oral argument. The dispute arises over several incidents that occurred during the performance of a fixed-price construction contract. This contract was let by the Department of the Interior's Bureau of Reclamation (Bureau) for the construction of a mile long, hard rock tunnel. The tunnel is known as the Santa Clara Tunnel and it was constructed to carry water from an inland reservoir to coastal California. For the reasons set forth below judgment is awarded to the plaintiff in the amount of $894,-913.

### Facts

The contract at issue was originally set for bid under the conventional drill-and-blast method of tunnel construction.[1] This was referred to in the contract's bid sheets as schedule one. Later in the pre-bid process the Bureau, in addition, approved bids under a second schedule. The second bid schedule allowed the use of a tunnel boring machine (TBM), as the principle method of construction. The plaintiff, Shank-Artukovich (Shank), a Joint Venture,[2] submitted a

---

1. "Essentially a drill-and-blast tunnel, which is sometimes called a conventionally driven tunnel, is a tunnel that is driven through rock by a process of drilling holes in the rock, putting some kind of explosive in the holes, getting everybody out of the tunnel, setting off the explosive which then loosens the material in the face of the tunnel and creates what is called a muck pile. Everybody goes back in the tunnel, mucks out the muck pile, puts it in cars and takes it out of the tunnel and then the cycle is repeated." Transcript of Proceedings at 28 (opening statement by Mr. Yaffe).

2. The Joint Venture consisted of a partnership between two closely held corporations, the M.L. Shank Company, which was controlled by Mike Shank, and John A. Artukovich & Sons, Inc., which was controlled by John Artukovich. Mr. Shank was the active partner in the Joint Ven-

bid under schedule two. Because it's bid offered the lowest unit price per meter of tunnel length, the contract was awarded to it on August 18, 1981. Soon thereafter plaintiff began construction.

Construction of the tunnel went well except for difficulties encountered in two distinct regions of the tunnel. In all but these two regions the TBM performed well and did not encounter any unforeseen problems. In the two regions in question, the plaintiff alleges that it encountered the ground condition that is termed as running [3] or breastboard [4] ground. In the first claim region at station 20 + 32 [5] the ground began sloughing away from the face of the tunnel and caused a delay in construction lasting from the 8th to the 22nd of February, 1982. More specifically, rock, ranging in size from two feet to six inches, began falling away from the tunnel face without the TBM even operating. This rock also included some fine material

and water. As this material was hauled away from the face by the conveyor belt, more material fell away, effectively stopping the tunnel's forward progress. During this period the tunnel heading was advanced only 76 feet, and approximately 380 cubic meters of muck [6] were removed. The sloughing from the face was eventually stopped by drilling holes over the top of the TBM shield [7] and pumping grout [8] into the area in front of the TBM. About 770 sacks of cement were used in this grouting operation. In the second claim region, at station 24 + 82, the conditions were essentially the same. The only difference being that the situation lasted from the 19th to the 30th of March, 1982, and required 420 sacks of cement to deal with. The total heading advancement for this period was approximately 52 feet. Shank's average daily progress under usual conditions was 75 feet. Thus, normally it would have only taken 1.7 days to drive the 128 feet that it took twenty five days to drive under the

---

ture. He was the sponsoring member and the managing partner. Artukovich & Sons contributed the TBM and the bonding capacity but did not actively participate in the construction of the tunnel. Transcript of Proceedings at 27.

3. In *running ground* the removal of the lateral support on any surface rising at an angle of more than about 34° to the horizontal is followed by a "run," whereby the material flows like granulated sugar until the slope angle becomes equal to about 34°. Running conditions prevail in clean, loose gravel and in clean, coarse or medium sand above the water table. In clean, fine, moist sand the run is preceded by a brief period of raveling. A ground with such behavior is cohesive running. Defendant's Exhibit 15 (an excerpt from a paper entitled Geologic Aspects of Soft Ground Tunneling by Dr. Karl Terzaghi, the acknowledged authority on tunneling geology) [Hereinafter cited as Terzaghi]. The tunnel in this case was through rock, not "soft ground," however, the central issue of claim one is whether the rock, in this instance, behaved unexpectedly like running or breastboard ground.

4. Breastboard ground means ground that would require breastboarding of the face if the tunnel were driven conventionally. Transcript of Proceedings at 35. As used here the court believes it is safe to say that running and breastboard ground have the same meaning. Breastboards are the timber or boards placed horizontally across the face of the tunnel to prevent gravel or other loose material from entering the tunnel. A Dictionary of Mining, Mineral, and Related

Terms, United States Department of the Interior, Bureau of Mines 137 (1968) [hereinafter cited as Dictionary] (for purposes of defining various terms used in this opinion, the court is taking judicial notice of the above cited dictionary pursuant to Fed.R.Evid. 201(b)).

5. The tunnel length is divided into fifteen stations. Each station is separated by 100 meters. Stationing begins far outside the tunnel at station 0 + 0 and ends, at the outlet portal, at station 30 + 08.833. The inlet portal of the tunnel is at station 15 + 38. Thus, the first claim region, at station 20 + 32, was encountered at 2032 meters from the beginning of the stationing, or 494 meters into the tunnel. The second claim region was at station 24 + 82 and was therefore 944 meters into the tunnel.

6. The broken rock or other material coming from a tunnel excavation. Dictionary, *supra* note 4, at 732.

7. The shield of the TBM is the outer casing of the machine. It serves two functions. It keeps rock and other debris from entering the TBM from above, and it provides support for the crown (roof) of the tunnel, just as forepoling and spiling does in a conventional tunnel.

8. a pumpable slurry of ... cement or a mixture of ... cement and sand, commonly forced into a bore hole to seal crevices ..., or to consolidate and cement together rock fragments in a grecciated or fragmented formation. Dictionary, *supra* note 4, at 515.

conditions encountered in the claim regions. The plaintiff alleges that the conditions described above differed materially from conditions indicated in the contract. This is the basis for plaintiff's first claim.

Upon plaintiff's completion of the tunnel, the contract called for plaintiff to install steel reinforcement (hoop rebar)[9] in areas where the tunnel was surrounded by extremely poor rock. The government, pursuant to the contract, designated nearly fifty percent of the tunnel to receive hoop rebar. However, when Shank refused to remove timber lagging[10] and/or spreaders[11] from the tunnel, the government issued an order requiring the contractor to either remove the timber or to install hoop rebar at its own expense. The contractor elected to install the hoop rebar and seek an equitable adjustment under the changes clause of the contract. This forms the basis for the plaintiff's third claim.[12]

The plaintiff's second and fourth claims originate from downward equitable adjustments taken by the contracting officer. The second claim arises because Shank did not install liner plate at the tunnel portals in accordance with the contract. The fourth claim arises out of Shank's refusal, because of safety reasons, to remove timber lagging or spreaders in most of the tunnel reaches. Each claim will be fully examined below.

### Jurisdictional Matters

■ The court's jurisdiction over this case is based upon the Contract Disputes Act, 41 U.S.C. § 609(a) (1982). Jurisdiction over claims one and three is not questioned. The government does, however, challenge jurisdiction over claims two and four. As the court understands it, the government is contending that the court does not have jurisdiction to review the contracting officer's decision to adjust the contract price downward.[13] Apparently, the basis of that contention is that Shank never filed a claim complaining of the contracting officer's action.

When the government seeks a downward adjustment in the contract price, the claim is a government claim. *Mutual Maintenance Co.*, GSBCA No. 7496, 85–2 BCA (CCH) ¶ 18098 (1985). This is so because the government has the burden of proof. *Id; see also Nager Elec. Co. v. United States*, 194 Ct.Cl. 835, 442 F.2d 936 (1971). Once it is determined that the claim is a government claim, then the contractor has the right to appeal the contracting officer's decision to this court without first filing a claim with the contracting officer. *See* 41 U.S.C. §§ 605(a), 609(a) (1982); *Gunn–Williams v. United States*, 8 Cl.Ct. 531, 534 (1985). It is clear that the government is seeking a downward adjustment of the contract price. It is also true that, as in *Mutual Maintenance Co.*, 85–2 BCA at ¶ 18098, the government has the burden of proof. Thus, this court has jurisdiction over the government's claims for downward adjustments in the contract price.

---

9. Hoop rebar is a circular steel reinforcing rod bent into large circles roughly the diameter of the tunnel. The steel is put around the walls of the tunnel with straight reinforcing rods, which connect the hoops, running parallel to the tunnel direction. Concrete is then poured around this "grid" down the length of the tunnel to be reinforced. The steel acts as a concrete reinforcer.

10. "Planks, slabs or small timber placed over the caps or behind the posts of the timbering, not to carry the main weight, but to form a ceiling or a wall, preventing fragments or rock from falling through." Dictionary, *supra* note 4, at 621.

11. "Pieces of timber which are placed with one end in the web of the set rather than on top. So they also span between sets but they are placed in the web. They are butted up against the steel of each set and they therefore resist the backward thrust when a blast is set off in the face of the tunnel." Transcript of Proceedings at 51 (opening Statement of Mr. Yaffe). "Sets are the frames set up for supporting the sides of an excavation." Dictionary, *supra* note 4, at 989.

12. For purposes of convenience of discussion the claims are not addressed in the order in which they were presented.

13. The last two sentences, in the last footnote of the defendant's brief, state "finally, Shank never filed a claim complaining of the contracting officers conduct in this regard. Therefore this court lacks jurisdiction to review Shank's belated claim filed in this court."

## Differing Site Conditions Claim

The plaintiff in it's first claim seeks an equitable adjustment under the differing site conditions clause of the contract. That clause provides for recovery in two different situations. A type one claim allows recovery when "subsurface or latent physical conditions at the site [differ] materially from those indicated in [the] contract." [14] A type two claim is awarded when the contractor encounters "unknown physical conditions, at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in [the] contract." The plaintiff alleges, in the alternative, both type one and type two differing site conditions.

■ In arguing the type two conditions, the plaintiff has no good ground upon which to stand or run. Type two conditions apply when the government has not included specifications in the contract. "Under category two ... the government has elected not to presurvey and represent the subsurface conditions with the result that a claimant must demonstrate that he has encountered something materially different from the "known" and the "usual." *Charles T. Parker Const. Co. v. United States,* 193 Ct.Cl. 320, 333–34, 433 F.2d 771, 778 (1970). Because the government has included specifications in this contract, the type two differing site conditions clause, included in this contract, does not apply here.

■ The plaintiff's argument and evidence, however, requires a thorough examination of the type one claim. A type one differing site condition is allowed when the actual site conditions vary materially from the conditions represented in the contract. The representations in the contract may be either expressly stated or implicit in the contract specifications. *Foster Const. C.A., v. United States,* 193 Ct.Cl. 587, 435 F.2d 873 (1970). In determining the contract requirements the contractor is bound to examine the contract in its entirety, including additional specifications, site exam-

inations, core samples, and boring logs. *J.F. Shea Co., Inc. v. United States,* 4 Cl.Ct. 46 (1983) *aff'd. on other grounds,* 754 F.2d 338 (Fed.Cir.1985). Furthermore, where a contractor has notice that conditions are other than described, he cannot obtain relief. This is so because the contractor must act reasonably as well as rely upon the representations in the contract. *Smith Contracting Co., v. United States,* 188 Ct.Cl. 1062, 412 F.2d 1325 (1969). The contractor also has the burden of proving his differing site conditions claim. *Nager Elec. Co. v. United States,* 194 Ct.Cl. 835, 442 F.2d 936 (1971).

■ In deciding a claim of this type, the court must determine whether the contractor's interpretation of the contract was reasonable. To do this the court must place itself in the shoes of a reasonable and prudent contractor. *P.J. Maffei Building Wrecking Corp. v. United States,* 732 F.2d 913 (Fed.Cir.1984). Because a claim of this kind "stands or falls upon what is indicated in the contract," *Stuyvesant Dredging Co. v. United States,* 11 Cl.Ct. 853, 858 (1987); *P.J. Maffei,* 732 F.2d at 916, the court must compare the subsurface conditions found in the tunnel to the subsurface conditions indicated in the contract.

## Subsurface Conditions

The central factual issue to be decided here is whether the ground in question entered the tunnel from the face or from the crown. There is much testimony on both sides of the issue. However, the court finds, for reasons given below, that the ground in question entered the tunnel from the face rather than from the crown.

The daily progress reports prepared by the government's own experienced inspectors are perhaps the most telling evidence on this issue. These reports were prepared at the site and shortly after the observances were made. The daily progress report for February 8, 1982, noted that the ground began sloughing away from the face and crown of the tunnel. The swing shift report for February 9, 1982, stated that "the ground ahead of the [TBM] con-

14. This is a quote from the standard differing site conditions clause included in this contract.

tinues to run." The day shift report for February 9, 1982 indicated that the "ground is running without benefit of mining." Several other daily reports reference this condition in terms of running ground. In addition, the daily report for March 19, 1982, stated "the seventh push started at 3:15, required forty muck cars to muck out, and will be excavated on the following report. The ground was breaking into the face at this point."

The testimony of Mr. Sparks, the government geologist who prepared the specifications, is consistent with the reports. Mr. Sparks confirmed on cross examination that the "face had broken away." Transcript of Proceedings at 667. Also a monthly progress report that Mr. Sparks had reviewed for accuracy stated that the "tunnel excavation proceeded normally until February 8th when the face at station 20 + 32.67 began sloughing away from the TBM." Transcript of Proceedings at 668.

The testimony of two of plaintiff's witnesses augments the court's conclusion that running ground was encountered in the tunnel. Both Jack Chambers, the safety supervisor for Shank, and Jerry Stokes, the plaintiff's project manager for the Santa Clara Tunnel, testified that, in a conventional tunnel, breastboards would have been required to stop the ground from running into the tunnel [15].

Contrary to the above evidence, the government argues that the ground entered the tunnel from the crown. The government puts on much expert testimony, particularly from Dr. Goodman,[16] that the subsurface conditions encountered must have been caving ground.[17] In the absence of the plethora of first hand evi-

dence, the court would find Dr. Goodman's testimony on this issue convincing. However, even Dr. Goodman's excellent theoretical analysis is not compelling enough to overcome the first hand evidence and testimony concerning the subsurface conditions encountered.

In addition, the government attempted to "impeach" the daily reports filed by the government inspectors. The defendant tried to show that Mr. Tannler, the government inspector who filed many of the daily reports discussed above, did not know the geological meaning of running ground. This testimony is not persuasive to the court. Mr. Tannler worked for the Bureau for nineteen and one-half years. During that time he was the construction inspector on several different tunnels and had gained much tunneling experience. The court is of the opinion that Mr. Tannler's first impressions of the ground in the claim regions are accurate.[18]

Similarly, the defendant makes much of Dr. Terzaghi's definition of running ground. According to Dr. Terzaghi, and the government, running ground consists only of gravel and sand. The evidence is clear that the ground in question consisted of rather large fragments of rock with some fines. Because of this the government argues that the conditions encountered could not have been running ground. This argument is simplistic. While the classic definition of running ground is that it behaves like granulated sugar, this does not circumscribe the phenomena. Whatever the terminological definition of this ground condition (and from the evidence the court must conclude this condition does

---

**15.** Transcript of Proceedings at 439 (testimony of Jack Chambers); Transcript of Proceedings at 482 (testimony of Jerry Stokes).

**16.** See *infra,* note 19 and accompanying text.

**17.** "Rock formations that will not stand in the walls of an underground opening without support such as that offered by cementation, casing, or timber." Dictionary, *supra* note 4, at 185. For purposes of this opinion caving ground can be defined simply as ground entering the tunnel from the crown.

**18.** Transcript of Proceedings at 734. Mr. Tannler also noted on the daily report for March 5, 1982, that "the term running ground used in previous reports should be considered inappropriate in as much as the ground was not running, as in a liquid state. Caving or sloping ground would have been appropriate." Because the plaintiff had given notice of its differing site conditions claim on February 19, 1982, and because a note such as this is not a natural part of the daily reports, the court is inclined to believe that this is merely a statement inserted in the document for purposes of litigation.

not lend itself to a neat classification), it behaved like running or breastboard ground. In this situation the proper question is whether the ground entered the tunnel from the face, not whether it met the exact Terzaghi classification. Because the court finds that the ground entered the tunnel from the face, and behaved like classic running ground, the question of whether the contract indicated this subsurface condition must now be addressed.

## The Specifications

█ The contract specifications provided that several forms of ground support, such as, spiling, forepoling, and rock reinforcements may be needed in the tunnel. The contract did not expressly refer to breastboards or to any other form of face support. Similarly, the specifications, found in paragraph 1.5.13 of the contract, listed the varying types of ground expected to be encountered in the tunnel:

> Ground connections (Terzaghi loading criteria) which may be encountered during tunnel excavation range from massive moderately jointed (class 3) and moderately blocky and seamy (class 4) to very blocky, seamy, and shattered. (class 5) Within shear and altered zones squeezing (class 8) and swelling (class 9) foundations may also prevail. It is anticipated that over 60 percent of the tunnel excavation will be through very blocky, seamy, and shattered ground (class 5) and that as much as half of this ground may be in extended reaches of shear zones where substantial side loads and squeezing pressures may be anticipated. (classes 8 & 9).

There was, however, no reference to running ground (class 6) in the specifications. The specifications also provided that, in addition to presupport (spiling, forepoling and rock reinforcement) in zones of sheared, very intensely fractured, or al-

tered rock, raveling behavior may be expected. Raveling ground, as defined by Dr. Terzaghi, occurs when "chunks or flakes of material begin to drop off the roof or sides some time after the ground has been exposed." [19] Although, there is testimony to the effect that raveling ground meant the same as caving ground,[20] there is no indication that raveling ground should be construed to indicate running ground. The specifications go on to include many references to the kinds of rock which would indicate ground conditions ranging from poor to good. The specifications, however, never expressly stated that running ground or breastboard ground was expected. It is also significant that no type of face support, such as breastboards, was referenced in the contract. Thus, there was no indication in the contract documents that ground would enter the tunnel from the face.

It is the court's opinion that the specifications did not indicate the type of ground behavior found in the tunnel. Thus, Mr. Shank's [21] failure to include running ground in the bid was reasonable. The reasonable and prudent contractor would not have, as Shank did not, expected to encounter running ground. The plaintiff is entitled to recover on its differing site conditions claim.

## Caving Ground Argument

Even if the court were to find, as the government so strongly argues, that the ground encountered was caving ground which entered from the crown of the tunnel, this alone would not preclude plaintiff's recovery. In judging the reasonableness of the contractor's interpretation of the contract, the court should put itself into the shoes of a reasonable and prudent contractor. *P.J. Maffei*, 732 F.2d at 913. There was much testimony about the mean-

**19.** Terzaghi, *supra* note 3.

**20.** Transcript of Proceedings at 689.

**21.** At this point it is appropriate to note that Mr. Shank has extensive tunneling experience. Since 1957, Mr. Shank has worked as project manager on at least eight different tunnels through several varied types of ground, includ-

ing running ground. He testified that the term running ground means "ground that will run immediately into the tunnel unless you restrain it someway." Transcript of Proceedings at 84. He has also been associated with several other tunnels in many different capacities and has been lead estimator on various tunnels throughout his career.

ing of the contract. The government argues that the contract documents, read in their entirety, gave the contractor notice that caving ground might be encountered. The government's well qualified expert witness Dr. Goodman [22] testified that a dipping shear zone in the direction of the tunnel drive caused the caving in of the face and crown of the tunnel at the point where the top of the tunnel intersected with the weak seam created by the shear zone.

The court understands this in terms of the following diagram.

The government's position is that shear zones of this type were indicated in the contract provisions and specifications. The specifications in paragraph 1.5.13 of the contract provided:

> the ridge is cut by many shears and shear zones, which vary in width from paper thin to tens of meters ... of the more than 500 shears and shear zones logged in core drill holes along the alignment, nearly 40 are greater than 1 meter in width as measured along the core access. Of these, 7 range from over 2 to more than 5 meters in width ... the drill hole (DH–114 located next to the first claim region) ranges from very intensely fractured to intensely fractured. The

shale and sandstone unit was recovered mostly in 20 to 180 mm core lengths. The sandstone and shale units have fractures spaced mostly 100 to 140 mm between depth 93 and 127 ... About 55 percent of the fresh DH–115 (the drill hole next to the second claim region) core is intensely fractured, with fractures generally spaced 70 to 200 mm apart, and 45 percent of the core is very intensely fractured with fractures spaced mostly 5 to 50 mm apart.

Dr. Goodman then testified, when asked what significance he placed on the above quoted specifications, that:

> the rock has been intensely fractured, more so than just about any tunnel rock

**22.** Dr. Goodman has a Ph.D. from the University of California at Berkeley, in the field of geological engineering. He has received several prominent awards and grants in his field. He is a professor at the University of California and has published three books used as textbooks in the profession. He has also published between 130 and 140 articles, and has another forty or fifty unpublished articles in circulation. Transcript of Proceedings at 950. Here the court feels compelled to note that Dr. Goodman's very high level of qualification enhances the court's belief that the specifications were too broad and did not properly warn reasonable and prudent contractors, in the vernacular of the trade, that running or caving ground was to be expected.

I've ever seen described in the specifications in the United States. The rock is really, really broken into small pieces in places. Apparently there are places where it is not. These pieces are fine, they are coarse gravel or small boulder size, and because these fractures are so prevalent I imagine that the rock has the potential to loosen during tunneling. That's my interpretation.

Transcript of Proceedings at 963.

The government also relies on the presence of caving at the bore holes as an indication of caving ground. Dr. Goodman testified as to the significance of caving at the bore holes:

because of the geological description in the previous sections, one knows that the reasons for caving are probably related to the intense fracturing of the rock ... [after testifying about the effect of gravity on tunnels and bore holes Dr. Goodman concluded] ... What I mean by that is if you have a bore hole that does not cave, it doesn't necessarily mean the tunnel wouldn't cave but if you have a bore hole that does cave, it certainly suggests a caving problem could occur in the tunnel.

Transcript of Proceedings at 964–65.

Mr. Shank, however, testified that the government, when asked about caving at the bore holes, indicated that it meant the possible presence of swelling [23] or squeezing [24] ground.[25]

Raveling ground, as noted earlier, was also mentioned in the contract. Raveling ground, as defined by Dr. Terzaghi, occurs when "chunks or flakes of material begin to drop off the roof or sides some time after the ground has been exposed." Mr. Sparks, the government's project geologist, testified that as far as he was concerned raveling ground and caving ground were the same. He further testified that raveling ground was an earth tunneling term, but in these specifications it *implies* rock blocks, which if not supported in the tunnel arch would fall into the tunnel and continue falling until a huge cavity is created above the tunnel arch. This definition is not in accord with Dr. Terzaghi's definition, nor is it consistent with what the evidence showed actually occurred at the two claim reaches.

### Use and Abuse of the Differing Site Conditions Clause

While it is true that a contractor has a duty to consider all of the specifications, he has no duty to conduct his own investigation, and is not bound to know that which only an expert could derive from the contract. *Kaiser Ind. Corp. v. United States,* 169 Ct.Cl. 310, 340 F.2d 322 (1965); *Pleasant Excavating Co. v. United States,* 229 Ct.Cl. 654 (1981). Furthermore, a contractor is entitled to rely on the contract specifications. *Hollerbach v. United States,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); *Dunbar & Sullivan Dredging Co. v. United States,* 65 Ct.Cl. 567 (1928). Here, there is much testimony from government expert witnesses and others suggesting that plaintiff should have realized that this type of rock behavior would occur. They rely on broad descriptions of

---

**23.** *"Swelling ground,* like squeezing ground, moves slowly into the tunnel, but the movement is associated with a very considerable volume increase of the ground surrounding the tunnel. Swelling conditions are likely to develop in tunnels through heavily precompressed clays with a plasticity index in excess of about 30, and in sedimentary formations containing layers of anhydrite." Terzaghi, *supra* Note 3.

**24.** *"Squeezing ground* slowly advances into the tunnel without any signs of fracturing and without perceptible increase of the water content of the ground surrounding the tunnel. Although the squeeze may not even be noticed, the loss of ground due to squeeze may be important enough to produce a conspicuous trough-like

subsidence of the ground surface above the tunnel. Squeezing conditions are met with in every tunnel through soft or medium clay." Terzaghi, *supra* Note 3.

**25.** The court notes that the government denies even making such a statement to Mr. Shank. However, this denial was based upon the absence of a reference to the statement in a memo of a telephone conversation between Mr. Shank and Paul Tilp, a Bureau employee. Plaintiff's Exhibit 107. In addition, because the memo did not contradict Mr. Shank, the court is not inclined to give great weight to this memo. Moreover, the court, based on observance at trial finds Mr. Shank to be a credible witness.

the type of rock to be encountered. These specifications could possibly lead some contractors to expect caving ground, however, they could also arguably lead some reasonable and prudent contractors to expect almost any type of ground. Based on these broadly worded specifications, the government argues that the contractor should bear the burden of failure to anticipate caving ground.

This argument is, however, inconsistent with the practicalities of government contracting and the purposes behind the differing site conditions clause. As stated in *J.F. Shea Co. v. United States:*

> The purposes served by the differing site conditions clause in a construction contract, which permits a contractor to seek an equitable adjustment in the contract price for a changed condition, is to prevent bidders from increasing their bid prices to protect against misfortunes resulting from unforeseen developments, *Chermus v. United States,* 110 Ct.Cl. 264, 267, 75 F.Supp. 1018, 1019 (1948), and thus avoid turning a construction contract into a "gambling transaction." *Peter Kiewit & Son's Co. v. United States,* 109 Ct.Cl. 517, 522–23, 74 F.Supp. 165, 168 (1947).

4 Cl.Ct. at 50. It is clear that the government did not expressly include the terms "caving ground" or "running ground" in the contract. They stopped short of using express terms to define the behavior that they actually seemed to expect, if Dr. Goodman's expertise is to be imputed to the government. What the government seems to have done was to include in the specifications language which could be construed by an expert to mean that caving or running ground should have been expected. In this manner the government avoids high bids and retains a sound argument for inferring caving or running behavior from the specifications. This occurs to the court to be a misuse of the differing site conditions clause.

If the government expected caving or running ground, it should have expressly said so. It expressly indicated swelling, squeezing, and raveling ground. If the

inference to caving or running ground was as clear as the government's witnesses maintain, then the terms should have been expressly included in the contract and not used as an opportunity to sandbag the contractor. It is clear to the court that Shank is a competent tunneling contractor, and that its principal, Mr. Shank, understood and relied upon the contract. The reliance that Shank placed upon the differing site conditions clause should not be lightly put aside. This clause saves the government substantial sums if used properly. If the government intends to represent that a certain type of subsurface ground exists, it should so state rather than drafting a document with ambiguous inferences to all types of ground. From the specifications neither caving nor running ground were foreseeable.

### Hoop Rebar Claim

The plaintiff next argues that the government's order to either install hoop rebar or to remove the lagging was a constructive change under the changes clause of the contract. In order to prove a claim under the changes clause the contractor must show that "[t]he government's representative, by his actions or his deeds [required] the contractor to perform work which is not a necessary part of his contract." *Industrial Research Assoc. Inc.,* DCAB WB–5, 68–1 BCA (CCH) ¶ 7069 at 32,986 (1968). When examining a claim of this type the court must compare the contract provisions with the government's actual requirements.

### Contract Provisions

In paragraph 6.1.1(b) the contract provided:

> The tunnel shall be reinforced with one layer of hoop bars at each portal as shown on the tunnel drawings. In other tunnel reaches surrounded by extremely poor rock, the contracting officer may direct the installation of one layer of hoop bars.

> For schedule 1 it was estimated that 50 percent of the tunnel length would require hoop reinforcement.

The contract further provided in paragraph 6.3.3(d):

> Removal—Timber lagging ... shall be removed as completely as practicable before concrete lining is placed. Where steel or precast concrete is used for lagging ... such lagging ... may be left in place ... Structural steel spreaders may be left in place. Timber and precast concrete spreaders shall be removed inside the "A" line and outside the "A" line where more than 50 percent of any one meter length of tunnel circumference is covered by timber and concrete.

The provisions in paragraph 6.1.1(b) distinguish between schedule one and schedule two. Under schedule one they provide an estimate that fifty percent of the tunnel may need hoop rebar. Since they do not provide an estimate for schedule two, the only criteria applicable is "extremely poor rock."

The evidence shows that the government originally directed installation of hoop rebar in about fifty percent of the tunnel. This hoop rebar was installed without incident. The question of hoop rebar for the rest of the tunnel did not arise until Shank refused, because of safety concerns, to remove lagging so as to expose fifty percent of each one meter length of tunnel. At this point the government directed Shank to either install hoop rebar at its own expense or to remove the lagging. Plaintiff elected to install the hoop rebar and seek reimbursement under the changes clause.

### Installation Criteria

The central issue to be decided here is whether the government directed installation of hoop rebar was based upon criteria other than the existence of "extremely poor rock." Since the plaintiff has the burden of establishing entitlement to an equitable adjustment, *Nager Elec. Co. v. United States*, 194 Ct.Cl. at 853, 442 F.2d at 946, it must put on evidence sufficient to convince the court by a preponderance that it is in fact entitled to an upward equitable adjustment. Here evidence has been introduced which, as plaintiff contends, shows that defendant relied on criteria other than that found in the contract. Mr. Sparks, the Bureau's project geologist for the Santa Clara Tunnel, testified on cross examination that the designers wanted hoop rebar in areas which were highly faulted zones with faults twelve inches or greater in width, and where the ground consisted of intensely fractured zones with open joints, and tunnel intervals with sustained ground water flows of three gallons per minute. Transcript of Proceedings at 690–91. This criteria is merely the government's equivalent of the "extremely poor rock" criteria and is consistent with the court's interpretation of "extremely poor rock."

Nevertheless, the government's criteria were not really relevant to the installation of hoop rebar in lieu of lagging removal. The plaintiff here is challenging only that portion of hoop rebar which was installed in lieu of removal of lagging, not the amount required pursuant to the first designationa and based upon "extremely poor rock" criteria. As regards the challenged portion of the hoop rebar, there is no evidence that the government directed installation of the hoop rebar pursuant to "extremely poor rock" conditions. On the contrary, the government maintains that the rock in those reaches of the tunnel was good enough to require the removal of the lagging. Therefore, the court finds that the government did not apply the criteria found in the contract to the reaches of the tunnel in question. Thus, the government changed the contract requirements.

The government also argues that the plaintiff voluntarily elected to install hoop rebar instead of removing the lagging. The court however, fails to see a voluntary election in this situation. On the one hand, plaintiff was risking a termination for default for failure to comply with a government ordered change and, on the other hand, plaintiff would have had to risk the safety of its employees to remove the lagging. Plaintiff chose the only reasonable, and perhaps possible, alternative. Because of the above, plaintiff is entitled to an equitable adjustment.

### Lagging Removal

■ The plaintiff's fourth claim challenges the government's right to a down-

ward equitable adjustment for failure to remove Coeur d'Alene lagging.[26] Since this is a government claim, the government has the burden of proof. *Nager Elec. Co.*, 194 Ct.Cl. at 835, 442 F.2d at 936. As with any claim under the changes clause, the court must compare the contract's requirements and the actions of the party who allegedly changed the contract to determine whether the work performed was that contemplated by the contract, or, in this case, was less than that contemplated by the contract. *Freund v. United States*, 260 U.S. 60, 43 S.Ct. 70, 67 L.Ed. 131 (1922).

The contract language relevant to this claim provides that timber lagging shall be removed as completely as practicable, and that timber spreaders shall be removed so as to expose fifty percent of each one meter length of tunnel. The government's argument is that it was safe to remove the timber; therefore, the failure to remove the timber was a change in the contract. In determining whether a change took place, it is necessary to address two factual issues: (1) Was the timber in question lagging or spreaders? (2) Was it safe to remove the timber?

### Function of Timber

The undisputed evidence showed that the timber in question performed two separate functions. The parties both recognized this fact. In certain instances, particularly, close to where the TBM was operating, the timber served a predominately spreader-like function. This is because a spreader's main function, in a TBM tunnel, is to absorb the thrust generated as the TBM moves forward. In a drill-and-blast tunnel it absorbs some of the force of the explosions at the tunnel face. Lagging, on the other hand, maintains the same support function in both kinds of tunnels. However, as the TBM moves further away from a particular point the spreader function diminishes as the lagging function increases. This is especially true after the TBM has holed through. At that point the timber no longer functions as spreaders at all but rather operates solely as lagging.

The court concludes that the timber is to be treated as lagging for purposes of this opinion. This conclusion is bolstered by the fact that timber installed, as it was in the Santa Clara Tunnel, is typically defined as Coeur d'Alene lagging. It is also supported by the fact that the plaintiff's reason for not removing the timber was solely related to it's lagging, and not it's spreader function. The government places substantial weight on the claim for the installation of hoop rebar that Shank filed with the contracting officer. In that claim, Shank describes the timber as spreaders. Reliance upon this language is, however, not dispositive as Shank used the term spreaders merely as a convenient way of addressing both functions of the timber.

### Safety of Removal

If the timber was lagging, it had to be removed only as completely as practicable. The next question then is: was it safe to remove the timber? The government argues that it was safe. It relies upon testimony that the lagging was not bent or broken. According to the government, bent or broken lagging supports great weight. In addition to this testimony, there is also testimony from government expert witnesses that, based upon their experiences in other tunnels, as well as the Santa Clara Tunnel, it was possible to safely remove the lagging provided that proper precautions were taken. However, no witness ever testified as to what the proper precautions would be.

The testimony of Mr. Zavattero, albeit the least credible of the government's witnesses,[27] is typical of government testimo-

---

**26.** This form of lagging is named after the town in Idaho where it was first used. Like spreaders, it is cut to fit between the sets rather than to lay on top of them. Dictionary, *supra* note 4, at 621.

**27.** The following exchange on cross examination between Mr. Zavattero and Mr. Miller,

when discussing the accuracy of a document, is demonstrative of this point.

Miller (Q):

Q. Did Mr. [Rocky] Smith ask you whether you concurred with this report which is Plaintiff's Exhibit 280?

Zavattero (A):

ny on this issue. Mr. Zavattero was a former employee of the California Division of Safety. His job was to inspect tunnels, like the one here, for safety problems. Mr. Zavattero testified that, in a conversation with Mr. Shank, he did not state that "his prime concern was whether to remove any of the lagging." Transcript of Proceedings at 838. Inconsistent with his testimony though, was a memo of the conversation made by Mr. Castello, the safety representative for the Bureau. The memo stated: "Wally Zavattero stated that his prime concern was whether it would be safe to remove any of the lagging." This and the absence of any other credible evidence of how the lagging could have been safely removed, leads the court to believe that evidence in support of the government's position is not adequate to overcome the government's burden.

Consistent with the court's determination above, plaintiff put on evidence that removal of the lagging could not have been performed safely. Several witnesses testified that it was particularly unsafe to remove the lagging in light of the conditions encountered at the two claim reaches dealt with in claim one. Dr. Goodman testified, on cross examination, that it was impossible to predict the size of any voids that could be created should support be removed. He also testified that to prevent caving the best procedure is not to allow the ground to move in the first place. Mr. Ehat, a contract administrator for the Bureau of Reclamation, testified that he estimated that 21,339 cubic feet of cement, along with some cribbing would be required to fill the voids left by the removal of the lagging. It was also clear to the court, from pictures introduced at trial,[28] that the lagging in many of the disputed areas was directly supporting substantial amounts of broken rock.

Further, there is evidence that while it cost about $400,000 to install hoop rebar in the disputed region, it would have only cost between $13,266 and $199,227 to remove the lagging.[29] Given the court's conclusion that Shank was a competent contractor, this evidence strongly supports the inference that Shank did have legitimate, serious concerns about the safety of lagging removal. Based upon the above evidence, the court concludes that it was not safe and therefore not practicable to remove the lagging. If it was not practicable to remove the lagging, the government is not entitled to a downward equitable adjustment as the nonremoval of such lagging was within the contract specifications.

### Liner Plate Claim

■ The last issue to be decided, plaintiff's second claim, is whether or not the plaintiff's failure to install liner plate entitles the government to a downward equitable adjustment. Again, the government has the burden of proving entitlement to the claim. However, unlike the lagging issue discussed above, the government has met its burden here. The contract provided in paragraph 6.1.1:

If the contractor elects to excavate the tunnel by means other than drilling and

A. No, I don't think he asked that statement. He asked me to identify it, I believe was the term. Maybe I'm using the wrong English.
Q. Didn't he ask you if you would verify it?
A. That's right, thank you.
Q. Verify it as accurate?
A. No. He didn't say that. He asked me if I would verify it.
Q. And what did you tell him?
A. I told him that I didn't work for the State anymore.
Q. Did you tell him that you probably would but you're not too interested?
A. I really wasn't interested; that's a true statement.
Q. And did you tell him you didn't work for the State anymore; you worked for money now?

A. I probably said that.
Q. And you told the same thing to Mr. Gurtz at the Justice Department when he called you later didn't you?
A. I certainly did.
Q. And Mr. Gurtz paid you the money, didn't he?
A. You are correct.
Transcript of Proceedings at 847–48.

**28.** Plaintiff's Exhibit, 229(a)–(v).

**29.** Defendant's Exhibit D22. Mr. Griffis estimated $199,227 to remove lagging in the disputed reaches of the tunnel. The plaintiff's estimate was $13,266.

blasting and proposes to excavate the tunnel with a full face, rotating cutter head type of boring machine, the following conditions shall apply: (bb) Details of connections to specified steel pipe liner at tunnel portals and accommodation of liner plate required at the outlet tunnel portals ...

In addition the contract provided in paragraph 6.3.3:

Steel liner plate tunnel supports shall be used for the support of the tunnel between stations 30 + 03.83 and 30 + 67 ... No separate payment will be made to the contractor for furnishing and installing steel-liner plate tunnel supports under schedule 2 and the cost thereof shall be included in the unit price per meter bid in schedule 2 ...

Read together, these provisions clearly require installation of liner plate at the outlet portal in a schedule two tunnel. Again this is a question of the reasonableness of the contractor's interpretation. If a contractor's interpretation is within the zone of reasonableness, the courts will construe the subject contract language and resolve all doubts against the government. *Salem Eng. & Const. Corp. v. United States,* 2 Cl.Ct. 803 (1983). Shank has interpreted the contract to allow other methods of support at the tunnel portals. This is not a reasonable interpretation. The mere fact that Shank did not believe the liner plate was necessary does not excuse it's disregard of clear contract requirements. No reasonable basis or unanticipated condition beyond Shank's preference supports its position. The contract required liner plate at the portals and the government is entitled to it, notwithstanding the fact that Shank did not include amounts for it in its bid. The contract clearly specified that amounts for liner plate must be included in the per meter unit price bid. Thus, the government's downward equitable adjustment is allowed.

30. Mr. Griffis was the Chief of Contract Administration, for the Bureau. The technical analysis was prepared at the request of the government's trial attorney.

## Damages

Plaintiff has alleged in its post-trial brief that it is entitled to a total damage award of $810,648. Plaintiff also requests a refund of $237,000 transferred to the government from escrow because of plaintiff's alleged failure to remove lagging and to install liner plate. Thus, a total recovery of $1,047,648 is possible. On the other hand, defendant's position is that, if plaintiff is entitled to damages, they should range from a low of $382,578, under the Griffis technical analysis,[30] to a high of $672,038 allowed under the Inspector General's audit report.[31] The court concludes that none of the above damage measurements are absolutely correct, although all make some useful points which the court has considered in reaching it's conclusions.

First, the court notes that the government's reliance upon the technical analysis is misplaced. The evidence shows that Mr. Griffis did little independent analysis but rather used figures provided by others. Mr. Griffis' testimony itself shows that many of his calculations are based upon unfounded assumptions and estimates. As a result the court discounts much of the technical analysis since it is a mere assertion of the government's litigation position.

Second, the court notes that the government has not strongly opposed many of plaintiff's damage calculations. In it's post-trial reply brief, the government makes only three arguments which, it contends, illuminate the exaggerated nature of plaintiff's claims. The government argues in that brief that: the two percent sponsors fee is a division of profit; the eight percent profit allowed under the technical analysis is correct; and that the twelve percent steel overrun caused by plaintiff's use of the TBM is not compensable. In addition to the three arguments included in the brief, the government relies, without further argument, solely upon the merits of the audit and the technical analysis.

31. The audit report was prepared by the Department of the Interior, Office of the Inspector General. It is an audit of Shank's differing site conditions and hoop rebar claims.

Contrary to the government's lack of textual support for it's positions, the plaintiff has argued extensively with evidence in support of each major element of it's damages. The court finds many of these arguments persuasive.

### Differing Site Conditions Recovery by Plaintiff

A. *Differing Site Conditions.* The plaintiff has alleged damages of $369,389 for this claim. Of this, the court is allowing $339,840, computed as follows:

| | |
|---|---|
| Direct Labor | $120,197 |
| Materials | $ 33,718 |
| Supplies | $ 48,429 |
| Subcontracts | $ 22,996 |
| Plant & Equipment | $ 13,414(a) |
| Indirect Labor | $ 27,977 |
| Indirect Other Costs | $ 21,542(b) |
| Profit @ 15% | $ 43,243(c) |
| Bond & Sponsor's Fee @ .02511% | $ 8,324(d) |
| Total Recovery on Claim One | *$339,840* |

(a). *Plant and Equipment.* Contractors are entitled to standby equipment costs. *Mid–West Const. Co. v. United States*, 198 Ct.Cl. 572, 461 F.2d 794 (1972). Here the government has not shown any reasonable objection to plaintiff's calculations. The court also finds that some machinery must have been idled during the periods of difficulty encountered at the two claim regions.

(b). *Indirect Other Costs.* The audit report challenged $107,000 of the total indirect cost calculation because the contractor had used a more "finely tuned" accounting system. The testimony, however, supports the conclusion that these costs are allowable in the total indirect cost calculations. Since there was a lack of testimony indicating why the proper placement of these costs was in some other specific item, the court allows the $107,000 into the base calculations of total indirect costs.

(c). *Profit.* Shank asks the court for a profit of twenty-five percent, and the government only wants to allow a profit of eight percent. The court, however, finds that profit at the rate of fifteen percent is proper. Mr. Shank testified that the project was bid at a profit level of fifteen percent. Neither the government nor the contractor should benefit, by way of increased or decreased profits, from the difficulties encountered in this case. A profit of fifteen percent will be applied to all damage calculations in this opinion.

(d). *Sponsor's Fee.* The partnership agreement indicated that Mr. Shank would be allowed a two percent sponsor's fee because of management and other skills. The fee was to be paid, notwithstanding a profit or loss under the contract, to M.L. Shank Co. This is well recognized in partnership law to be a management fee rather than a division of profits. *Friedman v. Golden Arrow Films, Inc.*, 442 F.2d 1099 (2d Cir.1971); *Neilsen v. Holmes*, 82 Cal.App.2d 315, 186 P.2d 197 (1947).

### Hoop Rebar Recovery by Plaintiff and Lagging Removal Credit

B. *Hoop Rebar.* The plaintiff has alleged damages of $441,259 for this claim. Of this, the court is allowing $361,314, computed as follows:

| Total Steel Work | | Total Cement Work | |
|---|---|---|---|
| Ironwork Labor | $151,473 | Labor Per Day Less 12% | $11,304(c) |
| Support Labor | $ 29,890 | Supplies Per Day | $ 2,938 |
| Supplies | $ 39,301 | Total Daily Costs | $14,242 |
| Materials | $222,856 | Daily Costs × 3 Days | $42,726 |
| Subcontracts | $ 30,316(a) | Plant & Equipment | 0(d) |
| Indirect Costs | $123,197 | Indirect Costs | $11,108 |
| Subtotal | $597,033 | Subtotal | $53,834 |
| Profit @ 15% | $89,554 | Profit @ 15% | $ 8,075 |
| Total Cost of | | Subtotal | $61,909 |
| Steel Installation | | Bond & Sponsor;s Fee | |
| throughout Tunnel | $686,87 | @ .02511% | $ 1,554 |
| Add'l Steel Cost | $303,497(b)(c) | Total Cement Work | *$63,463* |
| Bond and Sponsor's | | | |
| Fee @ .02511% | $ 7,620 | | |
| Total Steel Work | *$311,117* | | |

| | |
|---|---|
| Total Cement Work | $ 63,463 |
| Total Iron Work | $311,117 |
| Less Lagging Removal Credit | (13,266)(e) |
| Total Hoop Rebar Recovery | *$361,314* |

(a). *Subcontracts.* The court has determined that this figure is substantiated based upon testimony and other evidence given at trial. Plaintiff's Exhibit 275D; Transcript of Proceedings at 514.

(b). *Additional Steel Cost.* The total weight of steel was 875,117 pounds. Dividing total costs of steel by total weight gives a 78¢ per pound cost of steel. The total increase in steel weight caused by the wrongful designation of hoop rebar is 442,159 pounds.

This figure reduced by 12% (see subparagraph (c) below) is 399,099 pounds of steel. This number multiplied by the costs per pound (78¢) equals the costs of additional steel.

(c). *Twelve Percent Steel Overrun.* A contractor who encounters a condition leading to an equitable adjustment is entitled to recover the reasonable cost of performing the equitable adjustment. *Bruce Const. Co. v. United States*, 163 Ct.Cl. 97, 324 F.2d 516 (1963). An equitable adjustment is a corrective measure used to keep the contractor whole when the government modifies a contract. *Id.* at 100, 324 F.2d 516. Furthermore, the measure of an equitable adjustment is the "difference between what it cost to do the work and what it would have cost it if the unforeseen conditions had not been encountered." *Tobin Quarries, Inc., v. United States*, 114 Ct.Cl. 286, 334, 84 F.Supp. 1021, 1023 (1949). There are two reasons why the court concludes that the costs of the steel overrun should be borne by Shank.

First, the court finds that there was no agreement admitted into evidence which would establish that the parties had agreed to the increase in tunnel size at no cost to plaintiff. Secondly, Shank took the risk upon itself when it elected to construct the tunnel under schedule two. In the portions of the tunnel where the defendant properly designated installation of steel, Shank could not, and did not, complain that the tunnel was using more steel because of its election to use the TBM. Had the government properly directed installation of steel in the portions of the tunnel in question here, then Shank would have borne the cost of excess steel. Thus, the measurement of damages is the difference between what it would have cost had the designation to install steel been proper, and the costs of the improper designation. This leaves Shank bearing the burden of the twelve percent increase caused by the use of the

TBM. The same analysis applies to the increase in concrete labor cost.

(d). *Plant & Equipment.* The plaintiff has not met its burden of proving entitlement to this portion of it's damage claim, because there is no evidence of standby equipment or the acquisition of new equipment.

(e). *Removal of Lagging Credit.* The Griffis technical analysis sought to receive a credit of $199,227. Mr. Griffis based his calculations upon Mr. Ehat's analysis. Mr. Ehat's analysis is flawed because it is based upon assumptions which do not have a basis in fact. For instance, out of the $185,000 estimated, only $18,000 represented actual lagging removal. The remainder was for the costs of removing sloughed material and filling the voids thereby created with cribbing. Mr. Ehat himself testified that he could not accurately estimate the size of the voids that would be created by lagging removal. Transcript of Proceedings at 1008. He also estimated that seven employees would be required to remove the lagging although at least four daily reports had indicated that only two employees were needed for lagging removal where it was actually done. Since Mr. Griffis' technical analysis relies upon Mr. Ehat's infirm analysis, Mr. Griffis' analysis must also be infirm. In addition, there are no government calculations available which are based upon the assumption that it was safe to remove the lagging. Since lagging only had to be removed in areas where it was safe, the calculations should be based upon safe removal of the lagging. Therefore, the plaintiff's estimation of $13,266 is accepted because it is reasonable and because there is no credible evidence to the contrary.

Liner Plate Recovery by the Government

C. *The Liner Plate.* The government has alleged damages of $52,000 for failure to install liner plate at the outlet portal. The court concludes that the government is entitled to a credit of $43,241, calculated as follows:

| Liner Plate v. Lagging Labor Credit | $(2,362) |
|---|---|
| Labor Supplies Credit | $ (810) |
| Timber Credit | $(5,902) |
| Liner Plate | $35,049 |
| Welding | $ 2,620(a) |
| Pea Gravel | $ 468(a) |
| Subtotal | $29,111 |
| Indirect Costs | $ 7,568 |
| Subtotal | $36,679 |
| Profit @ 15% | $ 5,501 |
| Subtotal | $42,181 |
| Bond & Sponsor's Fee @ .02511% | $ 1,059 |
| Total Credit Due the Government | *$43,241* |

(a) The court has determined that Shank would have taken the lowest cost approach consistent with contract requirements. Shank would have used pea gravel as backfill and would have welded rather than bolted the liner plate to the sets.

Conclusion

In sum, plaintiff is entitled to recover $339,840 on its differing site conditions claim and $361,314 on its hoop rebar claim. Plaintiff is also entitled to a refund of the $237,000 converted by the contracting officer subject to an offset of $43,241 which is the government's recovery on its liner plate claim. Thus, the plaintiff is entitled to a total recovery of $894,913.

The Clerk is directed to enter judgment for the plaintiff in the amount of $894,913, plus interest pursuant to the Contract Disputes Act, to run from October 14, 1982, on $339,840, from October 15, 1982, on $361,314 and from December 20, 1983, the date on which the contract was completed, on $193,759. Costs to the plaintiff.