## J. PARR CONSTRUCTION & DESIGN, INC., Plaintiff,

v.

## The UNITED STATES, Defendant.

No. 501–89C.

United States Claims Court.

Sept. 5, 1991.

OPINION

SMITH, Chief Judge.

■ This case arises under a contract between the United States Coast Guard (Coast Guard) and J. Parr Construction & Design Company, Inc. (Parr)[1] for the restoration and repair of a lighthouse off the coast of Louisiana. On the basis of overwhelming evidence presented in conjunction with highly qualified and credible expert government witnesses, the court has no option but to dismiss the plaintiff's complaint. The evidence clearly tells the story of a contractor who was unable to adequately perform the job. While the court sympathizes with this small individual contractor, it must find that there was no basis for his abandonment of the job for the expressed reasons of safety. While there was clearly a sufficient basis for a default termination because of abandonment, there was also an adequate basis in both poor work quality and in a failure to comply with environmental regulations. The evidence also clearly shows that the government got nothing of value from the contractor's performance. While it is undoubtedly the case that the contractor lost a very significant amount of money and apparently his business on this job, the government cannot be made responsible for any of this loss. In a free economy it is vital that entrepeneurs bear the sole risk of their investments or contractual undertakings.

FACTS

I. The Lighthouse

The lighthouse, which was constructed in the 1890's, consists of an iron skeleton structure surmounted by a parapet and a lantern. The lantern is accessible from below by a spiral stairway enclosed in a cast iron cylinder. Below the lantern room is a circular room called the watchroom. Replacement of the floor plates in this room was at the heart of several of the disputes in this case. The lighthouse is located on an uninhabited island at the

Christopher Lerner, Washington, D.C., for plaintiff.

Ann L. Springer, Washington, D.C., with whom were Mary Mitchelson, Asst. Director, David M. Cohen, Director, Commercial Litigation Branch, and Stuart M. Gerson, Asst. Atty. Gen., Civil Div., for defendant. George Kuehnle, U.S. Coast Guard, was of counsel.

1. Parr is wholly owned by Mr. Jerral Parris, who was also the plaintiff's representative and its principal witness.

north end of the Chandeleur Island chain approximately thirty miles off the Louisiana coast in the Gulf of Mexico. The island is part of the Breton National Wildlife Refuge. Photographs of the lighthouse tower and pertinent parts of the tower structure are reproduced and labelled below for the benefit of the reader. [See Appendix.]

II. The Contract

On August 26, 1986, the Coast Guard and Parr entered into a firm-fixed-price construction contract in the amount of $88,840.00. Under the contract, Parr was to restore and repair the lighthouse. The contract required that Parr commence work within 30 calendar days after receipt of the notice to proceed (NTP) and to complete the work no later than 120 calendar days after receipt of the NTP.

Approximately one week before the bid opening date, in late July 1986, Mr. Parris, president of Parr, participated in a site visit which the Coast Guard District Civil Engineering Office conducted. The Coast Guard issued the NTP effective December 2, 1986. A pre-construction conference was held on December 2, 1986. The NTP required work to commence on December 3, 1986, with a completion date of March 3, 1987. Parr had begun working before December 2, 1986.

Almost immediately upon beginning the job various problems were encountered. The window frames in the lantern room were warped and after removing the first nine glass panels the last one shattered due to the pressure created by the frame. When the steel flooring plates in the watch room (the room just below the lantern) were removed the spiral staircase and its surrounding cast iron cylinder was alleged by Mr. Parris to have lurched out of place. A corrosion problem also developed in regard to the metal collar which leveled the steel flooring plates in the watch room. The collar, which was attached to the outside wall, was found to have largely rusted away.

On December 9, 1986, Parr stopped work on the project because some of the cast iron sockets which held the tie-rods or tension rods in place had been cracked when the rods were removed on the fifth or uppermost level of the iron skeleton supporting the lighthouse. These rods were to be replaced under the terms of the contract. On December 10, 1986, in response to a request from Parr, the Coast Guard authorized Parr to install safety chains and come-alongs to replace the tie-rods until a more permanent solution was devised. In a letter to the Coast Guard dated December 13, 1986, Mr. Parris indicated that as of December 12, 1986, the date the chains and come-alongs were installed, Parr deemed the tower safe.

Parr had been using an air-hammer for the task of tie-rod removal as the ends of the rods were rusted to the connecting pins. On December 12, 1986, the Coast Guard instructed Parr during a site inspection not to remove more than two tie-rods at a time, as Paragraph 2.1.1 of the contract specified. However, sometime after December 12, 1986, Parr removed the remaining six tie-rods on the fifth level, causing a number of the pad-eyes (a type of flange which was part of the original socket casting on the main supports) to break off. (The pad-eyes had a hole through them. A metal rod or pin went through the hole and one end of the tie-rod was attached to this pin. The other end was attached to a similar arrangement on the other side of the section.) From this breaking off of the pad-eyes, Mr. Parris concludes that the lighthouse was unsafe to work on. This is so, he contends, because it calls into question the structural integrity of the other cast iron members and hence the whole tower.

On December 17, 1986, the Contracting Officer sent Parr by certified mail a cure notice for deficiencies in contract performance. The cure notice itemized Parr's deficiencies: employees listed by Parr as general laborers were doing the work of welders and sheet-metal workers, in violation of the Davis–Bacon Act; there existed at the job-site no sanitary or food preservation provisions, in violation of Occupational Safety and Health Administration (OSHA)

regulations. In addition, the Contracting Officer notified Parr that work performance was unsatisfactory and "that should the Government terminate the contract for default, Parr would be liable for any excess reprocurement costs."

On December 22, 1986, Parr wrote to the Contracting Officer and informed her that the job had been shut down on December 20, 1986, due to the deterioration of the cast iron sockets. The sockets were attached to the four main supports or legs of the tower. The pad-eyes or flanges were part of the socket casting. There were eight connecting points on the upper sockets for the eight upper ends of the tie-rods and a similar arrangement for the bottom of the tie-rods. Only the upper socket pad-eyes broke in the effort to remove the tie-rods. Parr indicated that it was unsafe to work until the sockets were repaired and the tie-rods were replaced.

On December 29, 1986, Mr. Parris telephoned the Coast Guard and notified it that the remaining six cast iron sockets had been broken when Parr had removed the fifth level tie-rods connected to those sockets. Parr informed the Coast Guard that it was on "stand-by" waiting to hear from the Coast Guard regarding how to repair the cast iron sockets. Project Engineer Lt. Virginia Holtzman–Bell of the Coast Guard responded to those concerns by assuring Mr. Parris that the lighthouse was safe to work on and that work should continue. Before responding to Parr, Lt. Holtzman–Bell conferred with Coast Guard engineers and technicians who had discussed the absence of the tie-rods at the fifth level and determined that this did not jeopardize the safety of the structure. Despite the Coast Guard's assurances of safety and its repeated instructions to continue work, Parr refused. It insisted on a change order to the contract for additional work to repair the cast iron sockets so that the tie-rods could be attached. At this point it should be remembered that the chains and come-alongs were doing the work of the tie-rods until a solution was found to the broken pad-eyes.

On January 2, 1987, Parr wrote the Contracting Officer in response to the government's cure notice of December 17, 1986. Parr acknowledged that some workers had been underpaid and that there were no sanitary or food preservation provisions at the job-site. Parr also acknowledged that debris was being buried in shallow graves on the job-site rather than being removed from the site in accordance with Paragraph 1.1 of the specifications. Mr. Parris contended that he did not know if workers were working at high altitudes without wearing safety belts, but that the situation would nonetheless be rectified. Mr. Parris also indicated that he would continue to utilize the air hammer to remove rust from the structure, despite the Contracting Officer's objections to this method.

On February 5, 1987, Parr, through its counsel, wrote the Coast Guard requesting a meeting to discuss the situation. By letter dated February 11, 1987, the Contracting Officer acknowledged Parr's concerns for safety and its willingness to meet with the government. The Contracting Officer notified Parr that the Coast Guard had hired an architect/engineering firm, Prescott Follett and Associates, Inc., "to make a determination on your client's alligation [sic] of unsafe conditions and the cause of such conditions at the Chandeleur Lighthouse." The firm submitted its report on March 9, 1987, and confirmed that the lighthouse was safe for work. On March 30, 1987, Parr submitted to the Contracting Officer an itemized list of charges for costs and work allegedly incurred during the "shut-down" period.

On April 13, 1987, the Contracting Officer terminated the contract for default. In the court's view, the termination decision was justified on at least three separate bases: abandonment, poor work quality, and environmental violations. In the termination letter itself, the Contracting Officer listed several violations of contract specifications and deficiencies in work performance requiring termination of the contract. Among other things, the Contracting Officer determined that Parr had abandoned the job-site; surface preparation and painting were not in conformance with the con-

tract specifications; materials had not been stored properly—they were exposed to the wind and sand; and debris which had been buried on the island had been blown and scattered around the job-site. Additionally, the Contracting Officer determined that Parr had caused damage to the lighthouse structure by its utilization of the air hammer to remove rusted pins from the connectors. Because deficiencies listed in the government's earlier cure notice had not been corrected, the contract was terminated for default. Parr received the notice on April 15, 1987.

On January 5, 1987, Parr had submitted progress payment number one in the amount of $35,950.00. Payment was not made. On March 26, 1987, Parr submitted progress payment number two in the amount of $81,440.00. This payment also was not made. On April 18, 1988, Parr submitted a certified claim to the Contracting Officer for $317,525.00. On September 20, 1988, Parr received the Contracting Officer's final decision denying its claim. On September 15, 1989, Parr filed this action.

## DISCUSSION

### I. Termination For Default

■ Plaintiff asks this court to convert the government's termination for default into a termination for convenience.[2] The government bears the burden of proving that a default termination is proper. *SMS Data Products Group, Inc. v. United States*, 17 Cl.Ct. 1, 10 (1989) (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987)). In the instant case, the government has fully met this burden due to Parr's abandonment without cause, poor work quality, and environmental violations.

### A. *Abandonment Without Cause*

■ Plaintiff cites safety concerns arising from differing site conditions as the basis for halting work on the project. As a general matter, a contractor must continue

performance according to the terms of the contract until a differing site conditions dispute is settled. *Stammel Construction Company, Inc.*, 74–2 BCA ¶ 10,887 at 51,-804 (1974). "[T]he failure to proceed with the work alone justif[ies] a termination for default." *Id.* However, this duty to proceed is not absolute. This duty is suspended, for example, when conditions at the job-site differ materially from those in the contract such that the contractor possesses a reasonable belief of danger. *Id.* at 51,-804–05. In that instance, a contractor may be entitled to an equitable adjustment for additional work and may even discontinue work due to the dangerous conditions.

■ The court finds that Parr found conditions at most raising a reasonable basis for checking into structure safety. These safety concerns, however, did not justify any abandonment of the project. The Coast Guard addressed Parr's concerns and contract completion was not impracticable. Therefore, the Coast Guard correctly terminated Parr for default.

#### 1. Safety Concerns

Parr was not justified in abandoning the project because of alleged differing site conditions and the safety concerns arising from those conditions. By the date of the government's default termination—April 13, 1987—Parr had been demobilized since December 20, 1986. The government was reasonable in assuming abandonment. In response to Parr's alleged concerns about safety, Lt. Holtzman–Bell assured Mr. Parris on December 29, 1986 that the tower was safe to work on. On March 9, 1987, an independent architect/engineering firm informed the Coast Guard that it had determined that the tower was safe to work on in winds up to 35 mph. (For safety reasons, OSHA regulations prohibit workers from working aloft at wind speeds exceeding 35 mph.) The Coast Guard claims that it informed Parr of the results of this independent investigation sometime in March, 1987, prior to the default termination.

---

**2.** Under a termination for convenience, a contractor may recover costs and profit. Under a termination for default, a plaintiff forfeits un-

paid work in progress. *Discount Co. v. United States*, 554 F.2d 435, 437, 213 Ct.Cl. 567 (1977).

Parr disputes this claim, contending that it received a copy of this report only after the default termination of April 13, 1987. The court finds the government's version of this dispute more credible. In any event, the court notes that Mr. Parris admits being personally informed of the safety of the structure on December 29, 1986 during Lt. Holtzman–Bell's site inspection.

Parr and the government also dispute the degree of danger associated with further work on the lighthouse. The court is convinced that the Coast Guard's safety findings are accurate and that the structure was indeed safe to work on.

Parr relies on reports from William R. Faircloth, a metallurgist, and the report of the Pittsburgh Testing Laboratory, prepared by Walter Gretz, for its contention that the lighthouse was not safe for work. Faircloth concluded that the structure suffered from leaching type corrosion. Pl.Ex. 30, p. 152. This corrosion "can ... lead to failure." *Id.* Faircloth's report of July 6, 1987, states: "[T]he uppermost level must be considered unsafe." Pl.Ex. 30, p. 156. Later in that same report Faircloth again designates the uppermost level of the lighthouse as "unsafe" due to "graphitic corrosion." *Id.*

Plaintiff also engaged Pittsburgh Testing Laboratories to examine the condition of the structure. Their report, dated November 30, 1987, also declares the lighthouse unsafe. Pl.Ex. 28, p. 3. These determinations are disputed by government experts. The court agrees with the government's experts that these reports are suspect. Neither of plaintiff's experts testified at trial. The testimony of the government's experts showed neither of plaintiff's reports to be credible.

Dr. James O'Hara, the government's expert in metallurgy, questioned the validity of Faircloth's conclusions in his own report dated May 31, 1988 (Def.Ex. 3). O'Hara's site visit revealed no crack type corrosion or selective leaching type corrosion. Def. Ex. 3, p. 60. In his report and testimony, Dr. O'Hara maintained that graphitic corrosion only occurs in material submerged in water, not in the air of even marine envi-

ronments. Def.Ex. 3, p. 65. O'Hara found no corrosion products that would be expected after leaching type corrosion. *Id.*

Dr. O'Hara also disagreed with Mr. Gretz's report on several other grounds. Gretz concluded that the lowest tensile strength of the lighthouse was 15,000 psi. However, the test was performed on a piece of cast iron ⅛ inch in diameter. Dr. O'Hara testified that a minimum diameter of ½ inch is necessary for accurate results, according to the American Society for Testing and Materials (ASTM) requirements. Referring to Mr. Gretz's report, Dr. O'Hara concluded that he had "no faith in the accuracy of the tensile test results" and believed that the tests were "of no value." Dr. O'Hara also was puzzled by the fact that Gretz did not perform a hardness test, which is an easy and reliable way to measure tensile strength. Dr. O'Hara determined the structure's tensile strength from the carbon content of the structure. This content translates to ASTM A–48 Class 30, or a safe strength of 30,000 psi.

Gretz's report concluded the structure had a sulfur content of 0.142 percent. Dr. O'Hara reported that ASTM specifications for cast iron allow 0.15 percent sulfur. Therefore, the sulfur content was acceptable. According to Mr. Gretz, nodules in the cast iron were evidence of overheating. Dr. O'Hara disagreed with this conclusion, stating that if there was overheating there would be additional evidence of that fact. He explained the nodules as manganese sulfide formed as the metal cooled. Def. Ex. 3, p. 64.

Dr. O'Hara was further puzzled by the Energy Discharge X-ray (EDX) analysis performed by Mr. Gretz. The test detected chlorine on the surface. Dr. O'Hara accepted this conclusion as to be expected in the marine environment of the Chandeleur Island. However, the EDX analysis did not detect other expected elements such as manganese, phosphorus and sulfur, which are present in cast iron. According to the government's expert, the test served no purpose. Mr. Gretz's report has little credibility in the eyes of the court due to these deficiencies.

In contrast to the Pittsburgh Testing Laboratory report, Dr. O'Hara's own tests found the tower structure safe for work. The sole concern Dr. O'Hara identified as meriting attention was the compression struts, which he considered "suspect" due to heavy corrosion. Def.Ex. 20. p. 344. (Compression struts are the horizontal cast iron casings which extend between the main supports, or legs, of the tower and also between the legs and the cast iron cylinder containing the spiral staircase.) Dr. O'Hara indicated that the corroded condition of the struts was such that the structure could be compromised *in hurricane winds*. Of course, in hurricane conditions work would not be possible under any circumstances.

The court also is persuaded by Dr. Richard Powell's computer analysis of the structure. Dr. Powell based his analysis on Dr. O'Hara's findings.[3] He concluded that the structure was safe for repairs with two braces (tie-rods) removed at any one time. Additionally, the chains and come-alongs provided sufficient support for the top of the structure. Def.Ex. 1, p. 6. Both Dr. O'Hara's and Dr. Powell's testimony and its cross examination confirmed their credibility and the lack of support to be found in Parr's expert reports.

The evidence presented at trial also indicates that the Coast Guard had adequately addressed any legitimate safety concerns Parr might have had prior to the December 20, 1986 demobilization. On December 10, 1986, the Coast Guard authorized Parr to install safety chains and come-alongs to replace the tie-rods on the fifth level. The evidence shows that the chains and come-alongs alleviated any legitimate concerns Parr might have had in regard to safety. Mr. Parris even indicated in a letter to the Coast Guard that as of December 12, 1986, the date the chains and come-alongs were installed, Parr deemed the tower safe. Lt. Holtzman–Bell also testified that on De-

cember 12, 1986, she instructed Parr not to remove more than two tie-rods at a time, as Paragraph 2.1.1 of the contract specified, after the removal of two tie-rods on the fifth level resulted in broken pad-eyes. Parr, however, ignored the contract and these instructions when removing the remaining six tie-rods on the fifth level sometime after December 12, 1986. The court is simply not convinced that Parr's demobilization was precipitated solely, if at all, by concerns with safety. At trial, for example, Mr. Parris testified that he had expected and informed his workers that the project would only take three weeks. (The contract specified performance to be complete within 120 days, or approximately 17 weeks.) The court suspects that Parr's demobilizations of December 12 and 20, 1986 were intended primarily to improve worker morale and to adhere to the original time frame Mr. Parris had set for the project.

Parr's own safety violations also weaken its claims that safety concerns were the reason for demobilization. Specifically, Parr's violation of various OSHA regulations convince the court that safety was not the contractor's highest priority. Contract Section H required Parr to comply with 29 CFR 1926—Safety and Health Standards. The evidence shows that Parr violated several of these provisions.

The highly credible Project Engineer Lt. Holtzman–Bell testified at trial regarding conditions at the site. Workers were cooking inside the tent, although a separate kitchen tent is required. Workers had toxic paint caked on their hands for several days, with no solvent to remove it and nowhere to bathe except the ocean. The only other water available at the site was collected in visqueen lined holes. Additionally, raccoons were frequently seen rummaging in the tents on the job-site. Parr also buried trash instead of complying with OSHA standards of garbage removal. A

3. Using Dr. O'Hara's strength tests, Dr. Powell generated four models of the structure. Models simulated the structure 1) in its original configuration, 2) with the connection between tower structure and cylinder shell broken, 3) with two diagonal tie-rods removed, and 4) with all eight tie-rods removed on the fifth level. Additionally, the models included dead loads, live loads, and wind loads (at 58 mph instead of the 35 mph maximum allowed by OSHA). Dr. Powell used 150 mph hurricane winds due to actual conditions in the Gulf.

five gallon bucket provided the only toilet facility. Mr. Parris' testimony verified these conditions.

Conditions on the structure were potentially even more serious. Workers were on the top of the tower without safety belts. There was also no wind gauge at the site in violation of OSHA regulations. OSHA regulations prohibit workers from working aloft at wind speeds exceeding 35 mph. A gauge thus was necessary for compliance. Furthermore, workers were using a boatswain's chair, attached by rope, to suspend from the top of the tower. OSHA regulations require wire suspension for use with a cutting torch, as rope may accidentally burn.

According to Lt. Holtzman–Bell, who received information from the foreman on the site, sandblasters and painters were not provided ventilated hoods. Ventilation is critical in enclosed areas to protect workers from dust generated during sandblasting and from toxic fumes released during painting. Additionally, the contractor did not provide gloves for work with the toxic paints. Finally, in case any of these conditions resulted in an accident, Parr did not have an adequate radio for this rather isolated job-site.

### 2. Differing Site Conditions

Even if this court had found that the there were reasonable safety concerns, the contract was properly terminated because there were no material differing site conditions justifying Parr's abandonment of the project. The Differing Site Conditions Clause, Federal Acquisition Regulation 52.236–2, incorporated into Section I of the contract, provides for contractor recovery in two types of situations. A type one claim encompasses conditions that "differ materially from those indicated in [the] contract." FAR 52.236–2. "[U]nknown physical conditions ... which differ materially from those ordinarily encountered ..." establish a type two claim. FAR 52.236–2. A contractor must report these conditions to the government in order to obtain relief. *Id.* Plaintiff bears the burden of proof on either type of claim. *Shank–Artukovich v.*

*United States,* 13 Cl.Ct. 346, 360 (1987). Here, Parr failed to satisfy its burden.

#### a. I–Beams, Balcony Supports

At trial, Mr. Parris testified that he was concerned that the I-beams (architrave beams) on the structure would fail. However, Parr did not report this condition to the Coast Guard, as required by the Differing Site Conditions Clause. Therefore, Parr may not now assert these grounds. *See* FAR 52.236–2(c). Parr also asserted in its claim that the lantern's balcony supports, which extend around the exterior circumference of the watchroom, were severely deteriorated and could not safely support the scaffolding necessary for some of the exterior painting and sandblasting work. Again, however, Parr may not rely on this claim as it never addressed its concerns with the balcony supports to the Coast Guard.

Even more fundamentally, Parr never presented evidence to support its contentions in regard to the I-beams and balcony supports. Accordingly, the court cannot find that any differing site conditions existed with respect to the I-beams or balcony supports.

#### b. Floor Plates

During removal of floor plates on December 3, 1986, Parr claimed that the cylinder containing the staircase shifted out of plumb. At trial it was not established whether the cylinder had shifted during removal or whether it had always been slightly out of plumb. This condition was not addressed in the contract and Mr. Parris claims it was not noticeable during his site visit. At trial it was shown that the staircase was about one and ½ inch out of plumb. The evidence also showed that this amount was insignificant to either the structural integrity of the tower or any other safety concern. Further, it was never shown whether this out-of-plumb condition had occurred naturally over the years or resulted from the fact that Parr removed a number of the floor plates at once. Since Parr did not use the customary remove-replace-remove-replace method for

work on the floor plates, the shifting, if it occurred, apparently was caused by Parr's error. The contractor was therefore responsible for it and its consequences, if any. *See* FAR 52.236–7. In either case it is clear that there were no differing site conditions in regard to the floor plates justifying abandonment of the work site. Finally, even if the floor plates were a differing site condition, the government proposed a viable solution to the alleged concerns. Project Engineer Lt. Holtzman–Bell simply suggested that Parr replace the missing deck plates.

### c. Pad-eyes

Plaintiff blames corrosion for causing the pad-eyes on the cast iron sockets to crack and for making the lighthouse unsafe. Disputing this claim, the government presented evidence that the cracking occurred as a result of Parr's use of an air hammer in contravention of the terms of the contract.

As the corroded condition of the lighthouse was identified in the contract, Parr must show that actual conditions differed materially from those indicated in the contract. *Shank* at 350. A contractor with notice of such a condition will not succeed on this type of claim. *Id.* The contractor "must act reasonably as well as rely upon the representations in the contract." *Id.* (citing *Smith Contracting Co. v. United States,* 412 F.2d 1325, 188 Ct.Cl. 1062 (1969)). In reviewing this type of claim, the court "must place itself in the shoes of a reasonable and prudent contractor." *P.J. Maffei Bldg. Wrecking v. United States,* 732 F.2d 913 (1984).

The first issue to determine is whether the structure was indeed heavily corroded. Photographs placed in evidence and testimony at trial showed that the lighthouse did contain rust and corrosion. Actual corrosion was also identified in the contract. Contract Section 2050, Paragraph 1.3 states: *"Corrosion Difficulties:* Due to the advanced state of corrosion on all ferrous metal surfaces...." Paragraph 2.1.2 further warns of plating that is "heavily corroded." A site visit also provided an opportunity for Mr. Parris to observe the condition of the lighthouse.

Nonetheless, Parr contends that corrosion caused pad-eyes to break at the fifth level of the lighthouse immediately under the watchroom. The government attributes the failure to Parr's use of an air hammer, which was prohibited by the contract. At trial, however, the government did not definitively prove that Parr's negligence caused the cast iron failure. Parr, however, failed to meet its burden. At trial, Parr did not prove that corrosion was what caused the pad-eyes to break. However, the government clearly did prove that this condition did not reflect adversely on the safety of the structure.

Parr was entitled to halt work pending resolution of the pad-eye situation after reporting the cracks to the Coast Guard on December 9, 1986. The Coast Guard approved installation of chains and comealongs to replace temporarily the structural function of the tie-rods. This installation was completed December 12, 1986. Parr demobilized a second and final time on December 20, again citing the deteriorated sockets as the reason. As noted earlier, the court, however, questions the validity of Parr's asserted reason for demobilization. Considerable evidence suggests that Parr was not highly sensitive to the safety of its workers during the course of performance. The court notes Parr's admitted OSHA violations, discussed above, as one telling example of this lack of sensitivity.

On December 12, 1986, the Coast Guard responded to Parr's alleged concerns by instructing the contractor to continue with other work and forget replacement of tie-rods until the Coast Guard devised a solution. Thus, after December 12, 1986, the court must conclude that there were no differing site conditions justifying demobilization.

### B. *Poor Work Quality*

■ The government also properly terminated the contract for default on the basis of the poor quality of Parr's work. As testimony and trial exhibits show, Parr did not follow contract specifications re-

garding sandblasting and painting for the lighthouse. Section 3.4 of the contract ("Surface Preparation") required Parr to commercially sandblast the surface of the lighthouse and wipe it down with MEK solvent prior to paint application. Section 3.5 further required the painted surface to be finished "free from runs [and] drips...." Pl.Ex. 1, p. 65. According to Lt. Holtzman–Bell, on a December 29, 1986 site visit the "paint job was totally unacceptable." Lt. Holtzman–Bell found that the sandblasting preparation was incomplete and that Parr had not applied MEK solvent prior to painting. On March 26, 1987, a representative of the Contracting Officer, Robert Robinson, visited the site before the termination decision. Robinson found rust showing through the paint job. Robinson reported that only portions of the surface were completely painted and that due to improper preparation, even completely painted surfaces needed to be removed and redone.

Parr's poor workmanship in regard to the preparation and painting process is apparent merely by examining the lighthouse. Defendant's Exhibit 18, photographs 8–13, reveal the inadequate quality of the paint job. Sections of paint are missing, surfaces are bumpy and improperly prepared, and rust is noticeable.

Parr's failure to follow specifications for the prescribed demolition work also demonstrates the poor quality of Parr's performance. Paragraph 1.1 of the contract ("Demolition and Removal") required that "[a]ll materials resulting from demolition work ... shall become the property of the contractor and shall be removed from the boundaries of the property...." Instead, Parr, in clear violation of this provision of the contract, kept tie-rods and paint cans in shallow graves on the island.

Additionally, Paragraph 1.2 of the contract ("Protection") required Parr to protect materials that were to remain the government's property "by temporary covers, shoring, bracing, and supports." However, as Lt. Holtzman–Bell testified and Defendant's Exhibit 13, p. 317 reveals, material was not being stored properly. Glass panes were exposed to blowing sand and numerous floor plates and hand rails were strewn about the site.

The evidence also shows that welds put in place by Parr were of poor quality. Section 5500 of the contract ("Miscellaneous Metals and Steel Erection") called for materials to comply with certain American Institute of Steel Construction (AISC), American Society for Testing and Materials (ASTM) and American Welding Society (AWS) guidelines. Parr never produced submittals to show that replacement materials in fact met contract requirements. In addition, the evidence shows that galvanized materials were not touched up, as required on page 54 of the contract and, as of the time of trial, galvanizing that was applied by Parr had completely burned off, leaving much of the steel to rust. Finally, the evidence shows that the door weldings Parr put in place had broken off prior to the default termination.

The poor quality of Parr's work is further reflected in Parr's failure to perform certain aspects of the contract. Parr failed to install stairs and handrails and to replace floor plates on the watch room deck and on the lantern level. The inadequate quality of Parr's performance can also be demonstrated indirectly by the contractor's violation of various OSHA regulations, discussed above. While OSHA violations do not tangibly illustrate poor workmanship, such lapses certainly indicate a contractor's conscious disregard of accepted performance standards. This point is further illustrated by Parr's use of an air hammer, which violated Paragraph 1.3 of the contract, and may have damaged the pad-eyes.

### C. Environmental Violations

■ Mr. Parris acknowledges that Parr violated OSHA regulations and failed to satisfy Davis–Bacon Act requirements. These violations, not corrected after receipt of the Coast Guard cure notice, constitute breach of contract. However, the Davis–Bacon Act violations were not explicitly cited by the Contracting Officer as a reason for the default termination. The OSHA violations are also inapplicable to

the court's present analysis as Parr's workers were not present at the time the termination for default was made. The court, therefore, need not decide whether such violations also justify contract termination.

Conversely, Parr's violation of various environmental regulations was cited by the Contracting Officer as a reason for termination. The court will therefore determine the validity of this basis for termination.

■ Chandeleur Island is part of the Breton National Wildlife Refuge. Due to this status, the provisions of 50 CFR 27.94 apply. These regulations require that garbage on natural wildlife refuges be disposed of properly. In contravention of 50 CFR 27.94, Parr buried garbage generated during performance in shallow pits on the island. A post-demobilization site visit also showed that unsecured paint cans in the lighthouse had spilled on the sand.

Mr. Parris testified that he was not told the island was a wildlife refuge. However, the government's termination notice states that Mr. Parris was notified of the island's status during the pre-construction conference. The court believes that, regardless of whether Mr. Parris in fact was informed by the government, Parr had the responsibility of determining the status of the island.

## II. Equitable Adjustment

■ The court must also consider Parr's claim for an equitable adjustment. In its claim, Parr alleged that the warped window frames in the lantern room caused glass to shatter during removal. Parr requested a contract modification to allow for repairs before glass replacement. The Coast Guard denied Parr's request in a letter dated December 9, 1986.

The contract did not warn of this problem. The warping of the window frames therefore constitutes a differing site condition. The frame problem was discussed during the pre-construction conference on December 3, 1986. The first concern Parr had was that the panes could not be installed due to an uneven surface created by corrosion. The Coast Guard suggested placing putty in the frames before install-

ing the glass. The second concern Parr identified was that the holes were larger than the bolts. The Coast Guard suggested that the contractor place anchors to fit the bolts. These suggestions were reasonably easy cures for the problems raised by Parr. Plaintiff put forward no contrary evidence to these solutions at trial.

The third and more major concern regarding the windows was the torquing of the frames. The government contends that this problem was created by Parr's not adhering to the normal method of remove-replace-remove-replace. The government believes Parr was responsible for curing the problem it created. *See* FAR 52.236–7. The contract does not specify a manner for glass removal. However, the evidence at trial again supported the government's position.

The Coast Guard responded to the frame torquing situation by suggesting that Parr bend the frame back into position with a hammer, or alternatively, fill in the bottom of the frame with putty. Parr is correct that this suggestion is beyond contract specifications. However, as window replacement was not accomplished, Parr is not entitled to an adjustment for work not completed.

## III. Quantum Meruit

■ Based on the record before it and the testimony of the government's expert witnesses, the court is compelled to find that the government did not obtain any material benefit from the work performed by Parr. In fact, the evidence strongly suggests that the lighthouse and the project site presently stand in worse condition than they were prior to the commencement of performance. All of the surfaces painted by Parr need to be sandblasted, window panes must be replaced, broken pad-eyes must be repaired or replaced, and the debris and gear left by Parr must be cleaned up. As a result of these conditions, the court cannot grant any relief to Parr under a theory of quantum meruit.

## CONCLUSION

For the reasons set forth above, the court finds that the Coast Guard correctly terminated Parr for default. Differing site conditions and alleged safety concerns did not justify halting progress. The complaint must therefore be dismissed.

## APPENDIX

### View of lighthouse tower from below

1. Lantern glass
2. Watchroom level
3. Balcony
4. Fifth level tie-rod
5. Main support casing
6. Cast iron stair cylinder
7. Fourth level tie-rod
8. Cast iron sockets with pad-eyes
9. Compression strut

View of one corner of the cast iron framework under the watchroom level

10. Main support casing
11. Tie-rod
12. Cast iron sockets with pad-eyes
13. Radial compression strut
14. Peripheral compression strut

View from inside the watchroom with floor plates removed

15. Flange on which rusted away metal collar had rested
16. Chains and come-alongs which temporarily replaced tie-rods
17. Top of cast iron stair cylinder
18. Space formerly covered by floor plates