M.C. & D. CAPITAL CORPORATION, Appellant,

v.

The UNITED STATES, Appellee.

No. 91–1182.

United States Court of Appeals, Federal Circuit.

Nov. 7, 1991.

Rehearing Denied Dec. 9, 1991 and Jan. 22, 1992.

Larry E. Robinson, Anderson, McPharlin & Conners, Los Angeles, Cal., argued for appellant, with him on the brief was William R. Moore.

Jane W. Vanneman, Sr. Trial Counsel, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee, with her on the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director; also on the brief was Carlton Arnold, Dept. of the Army, Corps of Engineers, Louisville, Ky., of counsel.

Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This is another of the all too frequently seen cases in which a government contractor attempts to cut corners by substituting cheaper and lower quality materials, methods and services for those specified in the contract, and as a result is unable to perform the contract in accordance with its terms. In this case, the government terminated its contract with the appellant M.C. & D. Capital Corp. (MC & D) for default because of the contractor's failure to comply with the contractual terms, and retained $100,000 of the contractual price to cover the defaults.

The Armed Services Board of Contract Appeals (Board) upheld those actions, and also sustained the government's denial of the contractor's claim for an award for its value engineering change proposal it allegedly submitted to the government and the government allegedly accepted. *M.C. & D. Capital Corp.*, ASBCA Nos. 38181, 38300, 38301, 38483, 91–1 B.C.A. (CCH) ¶ 23,563. We affirm.

I

A. The following facts, as found by the Board and as shown by the record, are not in dispute.

In 1985, MC & D and the Army Corps of Engineers entered into a contract for the installation of a so-called rubber "membrane" roof and underlying rigid insulation on the roofs of four buildings containing sophisticated and sensitive electronic defense equipment. MC & D was to provide the government with a completed "membrane roofing system," comprising rubber sheets, bonding adhesives, sealants and other components that join the sheets together and to the underlying insulation and roof structure.

Two provisions of the contract are particularly important for purposes of this appeal. Paragraph seven provided:

Installation shall be in accordance with the manufacturer's approved instructions for applicable system, except as otherwise specified. Installer shall be a certified installer by membrane manufacturer for membrane system used for a period of not less than five years.

Paragraph nine provided:

Contractor shall provide membrane manufacturer's standard 10–year warranty upon final acceptance.

In its proposal that the government accepted, MC & D undertook to install a membrane system provided by International EPDM Rubber Roofing Systems, Inc. (IRS), a fabricator and installer of such systems. The membrane system would use rubber sheets manufactured by Colonial Rubber Works, Inc. (Colonial), IRS brand adhesives, and an IRS "bonded-plate" attachment system. The contractually-required warranty for the system would be provided by Colonial to IRS and by IRS to MC & D. The government approved this proposal.

At approximately the same time, MC & D hired Ken Register, a commission salesman of roofing materials, and requested that he propose a membrane system. Register had no affiliation with either IRS or Colonial and was not a manufacturer of rubber membrane systems.

At a subsequent meeting, MC & D introduced Register to the government as a "manufacturer's representative," who was affiliated with Colonial and with Weather Maintenance Services, Inc. (Weather). Weather was not a manufacturer of rubber sheets or membrane systems.

When Register attempted to arrange a sale from Colonial to Weather of Colonial's rubber membrane, however, Colonial refused to supply it because neither Register nor Weather could establish that Weather met Colonial's financial and technical requirements for membrane system manufacturers. Colonial informed Register that Colonial's warranty was not transferable, and that Colonial's policy was to sell and warrant only to full membrane system manufacturers. MC & D knew that neither Register nor Weather could meet Colonial's criteria for a membrane system manufacturer.

In July 1985, MC & D began installing the membrane roofing system containing the components Register recommended. MC & D purchased rubber membrane from IRS, which in turn purchased it from Colonial. Register then informed IRS that Weather had taken over the job as membrane system manufacturer, that Weather had underpriced IRS and would warrant the job, and that MC & D would cancel its order for rubber membrane unless IRS agreed to a lower price. IRS reduced its price, but informed MC & D that because it was supplying only the rubber sheets and not the IRS complete membrane system, neither IRS nor Colonial would issue any warranty for the job.

As the work progressed, Register informed the government that he was the "manufacturer's representative for Colonial working in conjunction with" IRS. The membrane system that MC & D installed was unique. It included components purchased by MC & D from various manufacturers and suppliers, contrary to the requirement of paragraph two of the contract that certain components come from a single supplier, and it had not been in use for at least five years, as the contract required.

Early in 1986, the government learned that Register did not represent either Colonial or IRS and that neither company would

warrant the system being installed. The government then instructed MC & D to stop work pending proof that a "membrane manufacturer's standard 10–year warranty will be given at the time of final acceptance." MC & D responded by forwarding a letter from Register containing sample warranties of Colonial, IRS, and a company Register had formed, and by assuring the government that the contracted-for warranty would be issued to Weather and that Weather would provide a complete system warranty. MC & D was allowed to proceed.

In August 1986, after MC & D stated that the work was completed, the government "took possession of the work" as substantially complete. Soon thereafter, problems arose. IRS informed MC & D and the government that it would guarantee only that it had delivered Colonial's first-line rubber, and would not go beyond that because the membrane system was not installed with IRS-approved materials or methods. This guarantee differed from the sample IRS warranty MC & D had earlier provided to the government and from the contractual requirement.

The government then paid MC & D the balance of the contract amount except for $100,000, which it retained pending completion of certain parts of the work, resolution of a Davis–Bacon Act dispute, receipt of the ten-year system warranty, and final acceptance.

Attempts by the government to obtain the 10–year full-system warranty the contract required were unsuccessful. The government ultimately agreed to accept a different warranty, on condition that MC & D also provide a bond or insurance policy protecting the government against any failure in the roofing system for the 10–year–warranty period. MC & D failed to provide either the bond or insurance.

Early in 1987, serious defects in construction appeared, involving numerous breaches of the roofs' water-tight barriers due to peeling patches, as well as other defects in workmanship. By the summer of 1988, the Government still had not received a standard, ten-year system warranty from MC & D. There were numerous uncorrected deficiencies in materials and workmanship. The government notified MC & D that it was contemplating termination for default if MC & D failed to correct the defects, provide either the contracted-for warranty or the other warranty plus proof of insurance, and provide information on prior use of the then-failing patches.

MC & D left the site in July 1988 without providing the contractual warranty and with numerous deficiencies uncorrected. An expert later determined that failure of the roofing system was imminent, due to numerous defects in materials and workmanship.

The government terminated the contract for default in October 1988.

B. The Board affirmed the default termination and the retention of the $100,000 contract payment.

It held that the termination was proper on three grounds: (1) the membrane system MC & D installed did not meet the five-year prior use requirement of paragraph seven; (2) MC & D failed to provide the membrane manufacturer's warranty, either as the contract originally specified in paragraph nine, or as the parties subsequently agreed; and (3) MC & D abandoned construction warranty work in July 1988, leaving various deficiencies uncorrected.

The Board ruled that the government's retainage of $100,000 (two-and-a-half percent of the contract price) was proper because (1) the contract authorized retention of up to ten percent of the contract price pending final acceptance of the work, (2) the government never finally accepted the work and (3) MC & D failed to complete construction warranty work and provide the required system warranty.

The Board also upheld the government's denial of MC & D's claim for a value engineering change proposal. The facts relating to that claim and the Board's treatment of it are set forth in Part IV of this opinion.

II

■ A. MC & D contends that the termination for default was improper because

the government finally accepted the work on August 22, 1986, when it took possession of the work as substantially complete, and that after such acceptance, the contract had been performed and therefore could not be terminated.

We agree with the Board that the government never finally accepted the work. Although the government took possession of the work as substantially complete in August 1986, the contract explicitly stated, in accordance with a Federal Acquisition Regulation (FAR 52.236-11), that government "possession or use" of the work "shall not be deemed an acceptance of any work under the contract." In the face of this provision, it is difficult to understand MC & D's argument that the government's taking possession of the work constituted acceptance. Indeed, the argument makes no sense, since one reason for this standard "use and possession" provision is to enable the government to examine and test substantially complete work before accepting it to insure that it meets the contractual requirements. *See Tyler Constr. Co.*, ASBCA No. 39365, 91-1 B.C.A. (CCH) ¶ 23,646 (Board, as well as contractor, recognized that government use and possession did not constitute final acceptance); *DeRalco, Inc.*, ASBCA No. 41063, 91-1 B.C.A. (CCH) ¶ 23,576 (even though contract nearly complete, no final acceptance because contractually required steps for final acceptance did not take place); *cf. Mike Bradford & Co.*, ASBCA No. 11196, 66-2 B.C.A. (CCH) ¶ 5831 (use and possession of complete or partially complete work may be deemed an acceptance, but only if government makes beneficial use of work and the work is completed in accordance with contract requirements).

MC & D argues that final acceptance occurred when the government took possession of the work as substantially complete in August 1986. In view of the numerous deficiencies in MC & D's performance existing on that date and the absence of evidence that the government enjoyed beneficial use of the site, the government did not thereby finally accept the work. Furthermore, the governing Corps of Engineers regulations indicate that the substan-tial completion date is a step preliminary to final acceptance, and state that substantial completion "can occur even though several items need yet to be completed." The subsequent events of "physical completion" and "final acceptance," required in those regulations, never took place.

The contract itself demonstrates the distinction between "final acceptance" and "use and possession." The warranty of construction provision states that "[i]f the Government takes possession of any part of the work before final acceptance, this warranty shall continue for a period of 1 year from the date the Government takes possession." This contract thus enabled the government to identify contract work as substantially complete and take possession of that work (thereby beginning the construction warranty period) without final acceptance. That is precisely what occurred here.

Moreover, as the Board stated, the government's actions after it took possession of the work showed that there had not been final acceptance. For example, in an October 1986 letter sent approximately two months after it took possession, the government stated that "[f]inal payment for the contract work will be withheld pending final acceptance of the contract work." The record shows numerous instances in which the government made clear it had not finally accepted the work and would not do so unless and until MC & D corrected the deficiencies in the work. MC & D never furnished the ten-year warranty which, under paragraph nine of the contract, it was required to do "upon final acceptance."

The Corps of Engineers regulations detailed the steps necessary for final acceptance. For example, the regulations required satisfactory completion of all contract work including administrative actions, recommendations for acceptance made to the contracting officer by those administering the contract, and final payment. None of those steps took place here. Moreover, under the contract only the contracting officer could finally accept the work. There is nothing in the record that even suggests,

much less establishes, that the contracting officer did so.

B. MC & D argues that even if the government did not finally accept the work, the government's termination of the contract was improper because MC & D substantially performed the contract. The government terminated the contract, however, not because MC & D had not completed the roofing work, but because MC & D's work did not satisfy the contractual requirements.

As noted, the roofing system that MC & D installed did not meet two of the explicit contractual requirements: (1) It was not installed by "a certified installer by membrane manufacturer" using a "membrane system used for a period of not less than five years" (paragraph seven); and (2) MC & D did not provide the "membrane manufacturer's standard 10–year warranty" (paragraph nine) (or the bond or insurance policy that the government insisted on as a condition for accepting MC & D's proposed alternative warranty). These were important requirements for the government, and MC & D's inability or failure to satisfy them was inconsistent with its present claim that the roofing it installed constituted substantial performance of the contract. *See Franklin E. Penny Co. v. United States,* 207 Cl.Ct. 842, 524 F.2d 668, 677 (1975) ("the doctrine [of substantial performance] should not be carried to the point where the non-defaulting party is compelled to accept a measure of performance fundamentally less than had been bargained for").

Moreover, the contract had a one-year warranty of construction, which became effective when the government took possession in August 1986. During that period, the roofing developed a large number of defects, which MC & D failed to correct after the government had notified the contractor of their existence. A contractor whose work contained so many uncorrected deficiencies did not substantially perform the contract. *Id.* Indeed, this contract required all work to be performed "in a skillful and workmanlike manner" and required the contractor to remedy at its expense any "defect in equipment, material, or design furnished, or workmanship performed by the Contractor or any subcontractor or supplier."

C. The foregoing discussion also is dispositive of MC & D's contention that the termination was improper because not justified by MC & D's conduct. In addition to MC & D's failure to comply with the five-year system use and ten-year warranty requirements, and to correct deficiencies during the one-year construction warranty period, MC & D breached the contract by abandoning the work and leaving the job site prior to correcting the deficiencies. The latter conduct itself justified the government's termination of the contract. *See J. Parr Constr. & Design, Inc. v. United States,* 24 Cl.Ct. 228 at 232 (1991) (abandonment of performance supports default termination by government).

### III

The contract incorporated the provisions of FAR 52.232–5(e) that "if satisfactory progress [in contract performance] has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved," and that "[w]hen the work is substantially complete, the Contracting Officer may retain from previously withheld funds and future progress payments that amount the Contracting Officer considers adequate for protection of the Government and shall release to the Contractor all the remaining withheld funds." After the government took possession of the work in August 1986, the government withheld from the balance due MC & D $100,000, which was two-and-a-half percent of the total contract price of $4,053,578, pending satisfactory completion of MC & D's contractual obligations. MC & D contends that the retention of the $100,000 was improper, on the ground that once MC & D had substantially performed the contract, it was entitled to receive the balance of the contract price.

Our holding in Part IIB that MC & D did not substantially perform the contract is

dispositive of this contention and requires its rejection. As the Board pointed out, the contract permitted the government to retain up to ten percent of the contract price and the $100,000 withheld was only two-and-a-half percent of that price. In a letter to MC & D written shortly after the $100,-000 had been retained, the government stated: "Final payment for the contract work will be withheld pending final acceptance of the contract work." As we have held, the government never finally accepted the work.

In view of the various deficiencies in MC & D's performance, the withholding of the $100,000 was fully justified to protect the government. Under the contract, the amount could have been four times larger. The government violated no law or regulation and did not abuse its discretion in retaining the $100,000 until MC & D had satisfactorily completed performance of the contract. *See Gavco Corp.*, ASBCA No. 29763, 88–3 B.C.A. (CCH) ¶ 21,095 (government retention of four percent of contract price pending correction of deficiencies proper when contract authorized retention of ten percent for that purpose); *cf. Columbia Eng'g Corp.*, IBCA No. 2351, 88–2 B.C.A. (CCH) ¶ 20,595 (excessive retention improper when not calculated to protect government interests).

## IV

■ The contract contained a detailed provision governing value engineering change proposals (VECP), under which the contract price or cost is reduced by changing the contract. The provision stated the procedures through which a contractor could submit a VECP, specified in detail the contents of a VECP, and required the contractor to submit VECPs to the resident engineer at the job site and send a copy to the contracting officer. The contractor was entitled to a specified share of the government's cost savings on any VECP the government accepted.

The contract required MC & D to remove and replace existing wooden nailers. Shortly after the contract was executed, MC & D notified the government that it intended to submit a cost breakdown for a VECP "in reference to wood nailers."

MC & D never submitted a VECP covering the wood nailers. Instead, the government and MC & D agreed to delete from the contract the nailer replacement requirement. The government by letter directed MC & D to submit a proposal to reduce the contract price to reflect the change. The letter stated that the price adjustment would be made pursuant to the "Changes" clause of the contract, and made no reference to a VECP.

MC & D and the government made a written modification of the contract that deleted the nailer replacement requirement and reduced the contract price by $261,-733.88. This modification did not refer to the VECP provision of the contract, and did not provide for MC & D to receive any portion of the government's cost savings. The modification stated: "This adjustment constitutes compensation in full on behalf of the contractor ... for all costs and markup ... attributable to the change."

In upholding the government's denial of MC & D's claim for a VECP allowance, the Board noted that although MC & D had stated that "it intended to submit a VECP on deletion of the nailer replacement requirement, it did not in fact do so"; that MC & D's submissions in connection with the deletion of the nailer requirement from the contract "did not contain any of the information contractually required for a VECP other than the cost savings of the deletion"; that the "two proposals did not identify themselves as VECP's, nor did they otherwise indicate that MC & D was to share in the cost-savings"; and that the contract modification:

> stated that the agreed price reduction of $261,733.88 was "compensation in full" for the change order. MC & D's present claim is for a reduction in that previously agreed "compensation in full," and is inconsistent with that agreement. There is nothing in the proposals leading up to the Modification, in the Modification itself, or in the 34 months of silence following its execution, indicating that the

parties excepted this claim from that agreement.

MC & D's VECP claim is barred by [the] Modification.

We agree with the Board that MC & D is not entitled to recover on its VECP claim. MC & D never complied with the contractual requirements governing the submission of VECP's. It signed the contractual modification without any reference either in the modification or in the submissions to the government that resulted in the modification, to its alleged claim for a VECP allowance.

MC & D and the government apparently treated the contract modification as fully disposing of all issues and claims relating to the nailers requirement, including a possible VECP claim that MC & D had said it intended to, but did not, file. Considering all the circumstances, the Board properly denied the VECP claim. *See Erickson Air Crane Co. v. United States*, 731 F.2d 810, 814–16 (Fed.Cir.1984).

## CONCLUSION

The decision of the Board is

AFFIRMED.